**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PEMBROKE PINES FIREFIGHTERS & POLICE OFFICERS PENSION FUND, Individually and on Behalf of All Other Similarly Situated, | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) ) | |
| | ) | Case No. 1:22-cv-4661 |
| | ) | |
| | ) | Hon. Steven C. Seeger |
| ABBOTT LABORATORIES, ROBERT B. FORD, ROBERT E. FUNCK, JR., CHRISTOPHER J. CALAMARI, and LORI J. RANDALL, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

Mark Filip
Joshua Z. Rabinovitz
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

James P. Gillespie (*pro hac vice*)
Joseph C. Schroeder
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington D.C. 20004
(202) 389-5000

Brad Masters (*pro hac vice*)
KIRKLAND & ELLIS LLP
60 East South Temple
Salt Lake City, UT 84111
(801) 877-8100

*Counsel for Defendants*

**Table Of Contents**

Preliminary Statement .................................................................................................1

Factual Background ......................................................................................................2

    A.    Powdered Infant Formula And The Recall ..........................................3

    B.    Plaintiffs' Claims ..................................................................................5

        1.    The Former Employee's OSHA Complaint ...........................5

        2.    FDA Form 483 Observations Regarding Sturgis..................6

        3.    Plaintiffs' "Confidential Source" Allegations......................8

Argument ......................................................................................................................9

I.    Plaintiffs Do Not Plead With Particularity An Actionable Misstatement. ...............10

    A.    Most Of The Alleged Misstatements Are Immaterial As A Matter Of Law. .............10

        1.    Statements Regarding Abbott Product Quality/Safety ....................11

        2.    Statements About Regulatory Compliance And Code Of Conduct................12

        3.    Statements Regarding Manufacturing Facilities And Processes.....................15

    B.    Plaintiffs Do Not Plead With Particularity Facts Showing Any Statement Of Fact Was False Or Misleading. .......................................17

    C.    Plaintiffs Do Not Plead Any False Or Misleading Statement Of Opinion. ...............22

    D.    Plaintiffs Do Not Plead Particularized Facts Showing An Actionable Violation Of Regulation S-K. ........................................23

II.    Plaintiffs Do Not Plead Particularized Facts Stating A Rule 10b-5(a) Or (c) Claim...............27

III.    Plaintiffs Do Not Plead Facts Giving Rise To A Strong Inference Of Scienter. ....................29

    A.    Plaintiffs Do Not Allege Scienter For Any Individual Defendant..............................30

        1.    The OSHA Complaint Does Not Support An Inference Of Scienter. ..........30

        2.    The Form 483s Do Not Support A Strong Inference Of Scienter. ................32

        3.    Plaintiffs' Attempt To Support Scienter Through Circumstantial Allegations Fails. .......................................35

    B.    Plaintiffs Fail To Allege Scienter For Statements Made By Abbott............................37

C.      The Most Compelling Inference From Plaintiffs' Allegations Is That
         Defendants Did Not Act With Scienter........................................................38

Conclusion .......................................................................................................................40

## Table Of Authorities

### Cases

*Acito v. IMCERA,*
    47 F.3d 47 (2d Cir. 1995) ................................................................................................... 39

*Anderson v. Abbott Labs.,*
    140 F. Supp. 2d 894 (N.D. Ill. 2001) ................................................................................ 24

*Argabright v. Rheem Mfg.,*
    201 F. Supp. 3d 578 (D.N.J. 2016) .................................................................................... 17

*Arora v. HDFC Bank,*
    2023 WL 3179533 (E.D.N.Y. May 1, 2023) ..................................................................... 27

*In re AstraZeneca Sec. Litig.,*
    2022 WL 4133258 (S.D.N.Y. Sept. 12, 2022) .................................................................. 15

*In re Bally Sec. Litig.,*
    2006 WL 3714708 (N.D. Ill. July 12, 2006) ..................................................................... 36

*In re Baxter Sec. Litig.,*
    2021 WL 100457 (N.D. Ill. Jan. 12, 2021) ....................................................................... 37

*In re Boeing Aircraft Sec. Litig.,*
    2022 WL 3595058 (N.D. Ill. Aug. 23, 2022) ................................................. 12, 16, 21, 30

*Bondali v. Yum! Brands,*
    620 F. App'x 483 (6th Cir. 2015) ...................................................................................... 25

*In re Braskem Sec. Litig.,*
    246 F. Supp. 3d 731 (S.D.N.Y. 2017) ........................................................................ 13, 14

*Chandler v. Ulta Beauty,*
    2022 WL 952441 (N.D. Ill. Mar. 30, 2022) ......................................................... 14, 21, 36

*Chu v. Sabratek,*
    100 F. Supp. 2d 827 (N.D. Ill. 2000) ................................................................................ 18

*City of Livonia v. Boeing,*
    711 F.3d 754 (7th Cir. 2013) ................................................................................. 31, 38, 39

*City of Livonia v. Boeing,*
    2010 WL 2169491 (N.D. Ill. May 26, 2010) .................................................................... 11

*City of Monroe v. Bridgestone,*
    399 F.3d 651 (6th Cir. 2005) ....................................................................................... 11, 12

*City of Pontiac Policemen v. UBS*,
  752 F.3d 173 (2d Cir. 2014) ............................................................................ 13, 26

*City of Taylor Police v. Zebra Techs.*,
  8 F.4th 592 (7th Cir. 2021) ............................... 1, 10, 16, 17, 18, 19, 22, 23

*Das v. Rio Tinto*,
  332 F. Supp. 3d 786 (S.D.N.Y. 2018) ........................................................ 14, 21

*Desai v. Gen. Growth Props.*,
  654 F. Supp. 2d 836 (N.D. Ill. 2009) ................................................................ 29

*DiLeo v. Ernst & Young*,
  901 F.2d 624 (7th Cir. 1990) .................................................................... 10, 40

*Dura Pharm. v. Broudo*,
  544 U.S. 336 (2005) ............................................................................................ 9

*Ferris v. Wynn Resorts*,
  462 F. Supp. 3d 1101 (D. Nev. 2020) ............................................................. 14

*In re Fifth Third Bancorp Deriv. Litig.*,
  2023 WL 2429009 (N.D. Ill. Mar. 8, 2023) .............................................. 36, 37

*Fogel v. Vega*,
  759 F. App'x 18 (2d Cir. 2018) ....................................................................... 27

*In re Ford Motor Sec. Litig.*,
  381 F.3d 563 (6th Cir. 2004) ........................................................................... 12

*Gallagher v. Abbott Labs.*,
  269 F.3d 806 (7th Cir. 2001) ........................................................................... 22

*Gallup v. Clarion Sintered Metals*,
  489 F. App'x 553 (3d Cir. 2012) ..................................................................... 29

*In re Genzyme*,
  2012 WL 1076124 (D. Mass. Mar. 30, 2012) .................................................. 33

*Heavy & Gen. Laborers v. Fifth Third Bancorp*,
  2022 WL 1642221 (N.D. Ill. May 24, 2022) .............................................. 13, 37

*Higginbotham v. Baxter Int'l*,
  495 F.3d 753 (7th Cir. 2007) ........................................... 27, 29, 31, 37, 39

*Hill v. The Tribune Co.*,
  2006 WL 2861016 (N.D. Ill. Sept. 29, 2006) .................................................. 37

iv

*Howard v. Arconic*,
  395 F. Supp. 3d 516 (W.D. Pa. 2019) ................................................................. 12

*In re Impax Labs. Deriv. Litig.*,
  2015 WL 5168777 (N.D. Cal. Sept. 3, 2015) ................................................ 25, 35

*Johnson v. Siemens*,
  2011 WL 1304267 (E.D.N.Y. Mar. 31, 2011) ..................................................... 40

*Kriendler v. Chem. Waste Mgmt.*,
  877 F. Supp. 1140 (N.D. Ill. 1995) ..................................................................... 24

*Kuebler v. Vectren Corp.*,
  13 F.4th 631 (7th Cir. 2021) .......................................................................... 2, 10

*La. Sch. Ret. Sys. v. Ernst & Young*,
  622 F.3d 471 (6th Cir. 2010) .............................................................................. 36

*Lachman v. Revlon*,
  487 F. Supp. 3d 111 (E.D.N.Y. 2020) ................................................................. 27

*Last Atlantis Cap. v. CBOE*,
  455 F. Supp. 2d 788 (N.D. Ill. 2006) .................................................................... 9

*Makor Issues & Rights v. Tellabs*,
  513 F.3d 702 (7th Cir. 2008) ........................................................... 29, 30, 37, 38

*Matrixx Initiatives v. Siracusano*,
  563 U.S. 27 (2011) ........................................................................................ 18, 24

*McDonald v. Kinder-Morgan*,
  287 F.3d 992 (10th Cir. 2002) ............................................................................ 17

*In re Midway Games Sec. Litig.*,
  332 F. Supp. 2d 1152 (N.D. Ill. 2004) ................................................................ 11

*In re Mylan Sec. Litig.*,
  2023 WL 3539371 (W.D. Pa. May 18, 2023) ...................................................... 17

*In re Nvidia Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) ............................................................................ 24

*Okla. Law Enf. v. Papa John's*,
  517 F. Supp. 3d 196 (S.D.N.Y. 2021) ................................................................. 26

*Omnicare v. Laborers District Council*,
  575 U.S. 175 (2015) ...................................................................................... 22, 27

v

*Ong v. Chipotle Mexican Grill*,
　　294 F. Supp. 3d 199 (S.D.N.Y. 2018) .......................................................................13

*Oran v. Stafford*,
　　226 F.3d 275 (3d Cir. 2000) ........................................................................... 23, 24

*Pension Trust v. DeVry*,
　　2017 WL 6039926 (N.D. Ill. Dec. 6, 2017) ...........................................................30

*Plumbers & Pipefitters v. Allscripts*,
　　778 F. Supp. 2d 858 (N.D. Ill. 2011) ......................................................................36

*Plumbers & Pipefitters v. Zimmer*,
　　673 F. Supp. 2d 718 (S.D. Ind. 2009) ............................................................. 39, 40

*Plumbers & Pipefitters v. Zimmer*,
　　679 F.3d 952 (7th Cir. 2012) .........................................................6, 24, 26, 40

*Pugh v. Trib. Co.*,
　　521 F.3d 686 (7th Cir. 2008) ........................................................... 10, 27, 28

*Rahman v. Kid Brands*,
　　736 F.3d 237 (3d Cir. 2013) ...................................................................................35

*Retail Wholesale & Dep't Store Union v. Hewlett-Packard*,
　　845 F.3d 1268 (9th Cir. 2017) ................................................................................14

*Rubinstein v. Credit Suisse*,
　　457 F. Supp. 3d 289 (S.D.N.Y. 2020) ...................................................................23

*Sanders v. RealReal*,
　　2021 WL 1222625 (N.D. Cal. Mar. 31, 2021) .......................................................35

*In re Sanofi Sec. Litig.*,
　　155 F. Supp. 3d 386 (S.D.N.Y. 2016) ...................................................................21

*Searls v. Glasser*,
　　64 F.3d 1061 (7th Cir. 1995) .................................................................................29

*Selbst v. McDonald's*,
　　432 F. Supp. 2d 777 (N.D. Ill. 2006) ............................................................. 31, 36

*Singh v. Cigna Corp.*,
　　918 F.3d 57 (2d Cir. 2019) .....................................................................................14

*Sjunde AP-Fonden v. GE*,
　　2021 WL 311003 (S.D.N.Y. Jan. 29, 2021) ...........................................................30

vi

*Stoneridge Investment Partners v. Scientific-Atlanta*,
552 U.S. 148 (2008) ............................................................................................28

*Stransky v. Cummins Engine*,
51 F.3d 1329 (7th Cir. 1995) ............................................................................18

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015) ..............................................................................24

*Tellabs v. Makor Issues & Rights*,
551 U.S. 308 (2007) ............................................................................10, 29, 38

*Van Noppen v. InnerWorkings*,
136 F. Supp. 3d 922 (N.D. Ill. 2015) ...............................................................12

*W. Palm Beach Firefighters v. Conagra*,
495 F. Supp. 3d 622 (N.D. Ill. 2020) ...............................................................11

*Wochos v. Tesla*,
985 F.3d 1180 (9th Cir. 2021) ..........................................................................25

*In re Yum! Brands Sec. Litig.*,
73 F. Supp. 3d 846 (W.D. Ky. 2014) ..........................................................14, 26

*In re Zagg Sec. Litig.*,
797 F.3d 1194 (10th Cir. 2015) ........................................................................37

**Statutes & Rules**

15 U.S.C. § 78j(b) ......................................................................................................5

15 U.S.C. § 78t(a) ......................................................................................................5

15 U.S.C. § 78u-4(b)(1) ...........................................................................................10

15 U.S.C. § 78u-4(b)(2)(A) ................................................................................10, 29

Federal Rule of Evidence 407 ...................................................................................37

Federal Rule of Civil Procedure 9(b) ........................................................................10

17 C.F.R. § 229.102 ...................................................................................................23

17 C.F.R. § 229.105(a) ..............................................................................................25

17 C.F.R. § 229.303(b)(2)(ii) .....................................................................................24

17 C.F.R. § 229.307 ...................................................................................................26

17 C.F.R. § 229.406(c)(2) ..........................................................................................13

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ........................................................................ 10, 24

SEC Rule 10b-5(a), 17 C.F.R. § 240.10b-5(a) .................................................... 1, 27, 28

SEC Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b) .................................................................18

SEC Rule 10b-5(c), 17 C.F.R. § 240.10b-5(c) .................................................... 1, 27, 28

17 C.F.R. § 240.13a-15(e) ..............................................................................................27

21 C.F.R. § 7.40(a) ..........................................................................................................18

79 Fed. Reg. 7934 (2014) ..................................................................................................3

**<u>Preliminary Statement</u>**

This is a securities fraud action filed against Abbott Laboratories, three Abbott officers, and one non-officer employee in the wake of a recall of powdered infant formula produced at Abbott's facility in Sturgis, Michigan, and a civil consent decree regarding Sturgis with the Department of Justice. While Plaintiffs go to lengths to allege regulatory compliance issues at Sturgis (often inaccurately), this case is not brought by consumers of infant formula or by regulators; it is a securities fraud case. Plaintiffs fail to allege the key elements of their claim: They do not allege any actionable misstatement, and they do not allege facts showing any Defendant knew any fact about Sturgis that was inconsistent with a public statement made by that Defendant. For several reasons, the Court should dismiss the complaint in its entirety.

*First*, Plaintiffs do not plead an actionable misstatement. A large majority of the alleged misstatements are immaterial as a matter of law. Most are "non-specific puffery" or "vague optimism" that do not make a "concrete assertion" and so are not actionable. *City of Taylor Police v. Zebra Techs.*, 8 F.4th 592, 595 (7th Cir. 2021). When making investment decisions, reasonable investors do not rely on statements, for example, that Abbott makes "safe, superior-quality products you can trust," or that Abbott keeps safety "at the forefront of everything we do." For other alleged misstatements, Plaintiffs do not plead facts showing they were false or misleading. Still other alleged misstatements are opinions for which Plaintiffs fail to allege facts meeting the even higher pleading standard for opinion statements. Finally, Plaintiffs' theory that Abbott violated SEC Regulation S-K fails because Plaintiffs plead no facts showing Abbott's Regulation S-K disclosures were false or misleading.

*Second*, Plaintiffs' claim for fraudulent conduct under SEC Rule 10b-5(a) and (c) fails because the conduct Plaintiffs allege—such as "failing to repair and upkeep machinery"—is not conduct that implicates the securities laws. Moreover, Plaintiffs do not plead wrongful conduct *by any Defendant*.

*Finally*, all Plaintiffs' claims fail for lack of allegations supporting a strong inference of scienter.

Plaintiffs fail to allege with particularity facts showing any Defendant knew about the alleged issues at Sturgis. Plaintiffs rely on five so-called "confidential" sources, but four of those supposed sources do not even purport to have information about what Defendants knew, and the fifth just speculates what Defendants "would have" known, which does not satisfy Plaintiffs' heightened pleading burden. The closest Plaintiffs come to alleging what any Defendant knew is their allegation that Lori Randall was copied on Abbott's responses to two FDA Form 483s, but Randall only made a single supposed misstatement—a puff interview in a trade magazine. Naming Randall as a defendant is a transparent, and unsuccessful, attempt to dodge the dispositive defect that Plaintiffs have no information about what the Abbott officers who spoke publicly knew. Plaintiffs' allegations fail under settled precedent.

## Factual Background

Abbott is a healthcare company employing over 115,000 employees across more than 160 countries and four principal divisions: Medical Devices, Diagnostics, Pharmaceuticals, and Nutrition. (Dkt. #35 ("Compl.") ¶ 37; Ex. 1 at 4, 6-7, 15)[1] Abbott operates 90 manufacturing facilities world-wide. (Ex. 2 at 15) The Nutrition division manufactures products at 14 facilities and has three main product lines: infant formula, adult and pediatric nutrition products (such as Ensure and Pedialyte), and tube-fed products used in healthcare facilities. (*Id.*; Compl. ¶ 38)

Notwithstanding the breadth of Abbott's businesses and products, this lawsuit focuses narrowly on powdered infant formula made at Abbott's facility in Sturgis, Michigan. Plaintiffs admit that Sturgis is one of multiple Abbott facilities that produces powdered infant formula; other U.S. plants are in Arizona and Ohio. (*Id.* ¶ 42) In 2021, Abbott's revenues exceeded $43 billion, of which the Nutrition division contributed $8.29 billion, less than 20%. (Ex. 2 at 50) Of that figure, U.S. sales of

---

[1] In addition to the complaint's allegations, the Court can consider on a motion to dismiss documents incorporated by reference into the complaint and documents subject to judicial notice. *Kuebler v. Vectren Corp.*, 13 F.4th 631, 636 (7th Cir. 2021). The exhibits cited in this brief each come under one or both of those exceptions. *See* Decl. of J. Rabinovitz, submitted herewith.

pediatric nutritional products totaled $2.19 billion, just 5% of revenues. (*Id.* at 28, 50; Compl. ¶ 38) And that 5% includes non-formula pediatric products, liquid formula, and powdered formula made at other facilities. Thus, Sturgis contributed substantially less than 5% of Abbott's overall revenues.

### A. Powdered Infant Formula And The Recall

On February 17, 2022, Abbott announced a recall of powdered infant formula manufactured at Sturgis. (Compl. ¶ 360) Simultaneously, the FDA issued a release "advising consumers not to use Similac, Alimentum, or EleCare powdered infant formulas" that originated from Sturgis. (*Id.* ¶ 184) The FDA explained that it was "investigating consumer complaints of *Cronobacter sakazakii* and *Salmonella* Newport infections" that were purportedly linked to formula produced at Sturgis. (*Id.*) The FDA and CDC "later determined the *Salmonella* case to be unrelated to the Abbott Nutrition facility." (Ex. 3 at 13) Abbott's announcement noted that testing at Sturgis "found evidence of *Cronobacter sakazakii* in the plant in non-product contact areas." (*Id.* ¶ 190) Following the recall, Abbott temporarily stopped production of powdered formula at Sturgis. (*Id.* ¶ 12)

Cronobacter is a naturally-occurring bacteria that the FDA describes as "ubiquitous." (Ex. 4) It "can survive on almost every surface." (Compl. ¶ 59) "Cronobacter infections are rare and, for most people, the bacteria are harmless," but it can pose serious complications for infants. (*Id.*) Moreover, although liquid formula is produced through a process that sterilizes it, powdered formula is not. Indeed, the FDA explains that, "based on current technologies, it is not possible to produce a sterile powdered infant formula." 79 Fed. Reg. 7934, 7987 (2014). Consequently, because Cronobacter is naturally ubiquitous and because powdered formula is not sterile, the FDA regulation on infant formula "does not establish a zero tolerance for Cronobacter." *Id.*

Plaintiffs allege that before the recall the FDA received four complaints of Cronobacter infections supposedly "linked" to Sturgis. (Compl. ¶ 67) But the CDC conducted genetic testing on samples from two of the infected infants—the only available samples—and compared those samples to

3

the bacteria identified at Sturgis. They did not match: The CDC "did not find these samples from patients to be closely genetically related to the multiple strains of Cronobacter found in the environmental samples obtained from Abbott Nutrition's Sturgis, MI facility." (Ex. 5 at 4) The CDC also compared the samples from the two infants against each other to determine if the infants were infected with the same Cronobacter strain—something that might indicate a common root cause. Again, they did not match: The bacteria from the two infants "were not closely related to one another." (*Id.*)

These results were not surprising: Even when an infant becomes ill and the formula the infant consumed tests positive for Cronobacter, that does not indicate Cronobacter was introduced during the manufacturing process, rather than, for example, at home after the can was opened or in another place where it was later mixed. Powdered formula does not come in single-serving containers, but in cans that may last days or weeks after being opened. Cronobacter may be introduced into the can at any point during that time. As the CDC explains, Cronobacter has been "recovered from many … environmental sources in the home, including kitchen sink surfaces, pacifiers, bottles, household utensils, vacuum cleaning bags, and other foods." (Ex. 6 at 224) The CDC further explains that "[i]n the home, Cronobacter could get into powdered formula in these ways," including "[i]f you place formula lids or scoops on contaminated surfaces and later touch the formula" or "[i]f you mix the formula with contaminated water or in a contaminated bottle." (Ex. 7) The CDC advises that the bacteria's environmental prevalence "makes it difficult to identify the specific sources of infections." (Ex. 4)

On May 16, 2022, Abbott and three Nutrition division employees (including Defendant Randall) signed a civil consent decree with the U.S. Department of Justice. (*Id.* ¶ 16) The three other Individual Defendants are not parties to the consent decree nor mentioned in it. The consent decree "sets out what Abbott must do to resume safely manufacturing infant formula at the Sturgis facility." (Ex. 8) On July 1, 2022, just six weeks later, Abbott restarted production at Sturgis. (Ex. 1 at 22)

### B.     Plaintiffs' Claims

As is now commonplace, Plaintiffs seize on a regulatory event and attempt to bootstrap a claim for securities fraud under § 10(b) and § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) & § 78t(a).   Plaintiffs seek to pursue a class action on behalf of investors who purchased Abbott stock between February 19, 2021 and October 19, 2022.  (Compl. p. 1)  They name as defendants Abbott, CEO Robert Ford, CFO Robert Funck, head of U.S. Nutrition Christopher Calamari, and a non-officer employee within the Nutrition division's quality organization, Lori Randall.  (*Id.* ¶¶ 30-34)  Plaintiffs claim that Defendants' statements both before and after the recall were fraudulent.  They also claim Defendants' conduct manipulated Abbott's stock price.  In attempting to connect Defendants to the alleged events at Sturgis, Plaintiffs rely principally on three allegations:

### 1.     The Former Employee's OSHA Complaint

Plaintiffs allege a former Sturgis employee filed a complaint with OSHA in February 2021.  (Compl. ¶ 99)  The OSHA complaint asserted Sturgis employees violated regulations, including by "[r]eleasing untested infant formula" and "falsifying records."  (*Id.* ¶ 103)  For example, the complaint alleged that, rather than discarding an entire batch of formula if a portion of it "tested positive for micros," Sturgis personnel instead only culled a part of the batch produced during a specified period of time before and after the portion that tested positive was produced—a process called a time-code removal—and released the remainder "without supporting documentation to suggest that it was compliant and safe for consumption."  (*Id.* ¶ 111)  Significantly, Plaintiffs do not allege time-code removals violate any regulation or that the FDA has ever asserted this practice is improper.  Nor do they allege the OSHA complaint made any reference to Cronobacter or Salmonella whatsoever.

Plaintiffs do not allege the complainant sent his OSHA complaint to any Defendant or that any Defendant learned of the allegations before the Sturgis recall.  Plaintiffs allege the complainant's lawyer sent a letter to Abbott's General Counsel "notifying Abbott of the need to preserve records

associated with the Whistleblower." (*Id.* ¶ 108) But that letter was dated September 19, 2020, *before* the February 2021 OSHA complaint. (Ex. 9) Additionally, the letter did not explain what the complainant's allegations were or what records he wanted Abbott to preserve. (*Id.*) Plaintiffs allege that an Abbott lawyer acknowledged receipt of the letter (Compl. ¶ 108), but they notably omit that the acknowledgement explained that "Abbott is not aware of any 'complaint[] filed with Michigan and federal authorities' nor any claims that Mr. [redacted] may have against it." (Ex. 10) Plaintiffs further omit that the acknowledgement asked the complainant to "advise me as soon as possible as to the substantive nature of the potential claims that Mr. [redacted] may have so that Abbott is able to identify and preserve the potentially relevant information." (*Id.*)

## 2. FDA Form 483 Observations Regarding Sturgis

Plaintiffs allege FDA inspectors issued FDA Form 483s to Sturgis in 2019 and 2021.[2] "An FDA Form 483 is issued to firm management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment *may* constitute violations of the Food Drug and Cosmetic (FD&C) Act." (Ex. 11, emphasis added) "In industry jargon, a '483' is an observation by an inspector, providing information about 'significant objectionable conditions' (not serious enough to merit a warning or any formal action by the agency) that the inspector believes will be useful to the company." *Plumbers & Pipefitters v. Zimmer*, 679 F.3d 952, 955 (7th Cir. 2012). A Form 483 "does not constitute a final Agency determination of whether any condition is in violation of the FD&C Act or any of its relevant regulations." (Ex. 11) The FDA issues *thousands* of Form 483s each year. (Ex. 12) The FDA generally does not publicly disclose Form 483s.

A company must "respond to the FDA's observations within fifteen business days with a root cause analysis, impact assessment, and a set of corrective and preventative actions." (Compl. ¶ 71) "If the FDA finds a company's responses to a Form 483 to be inadequate, it may issue a warning letter

---

[2] Plaintiffs also allege inspectors issued a Form 483 in March 2022, but this was after the recall. (Compl. ¶ 209)

in order to prompt a company into voluntary compliance with the Act." (*Id.* ¶ 72) A warning letter indicates the FDA has found "a manufacturer has significantly violated FDA regulations." (Ex. 13) Unlike Form 483s, the FDA discloses warning letters publicly: www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/compliance-actions-and-activities/warning-letters.

Plaintiffs allege FDA inspectors issued a Form 483 to Sturgis in September 2019. (Compl. ¶¶ 162-68) They do not allege anything about Sturgis's prior inspection history, although they allege the FDA usually inspects manufacturing facilities like Sturgis annually. (*Id.* ¶ 68) The 2019 Form 483 made a single observation: "during packaging on Packaging Line [redacted]," Sturgis employees tested for Salmonella by collecting two samples from thirty containers instead of one sample from sixty containers. (Ex. 14 at 1)[3] The Form 483 stated it "d[id] not represent a final Agency determination." (*Id.*) As noted, Abbott was required to respond within 15 days, although Plaintiffs do not allege what Abbott said in response to the Form 483. Critically, they do not allege the FDA challenged the response, issued a warning letter, or brought any enforcement action after receiving the response. And public documents establish that FDA inspectors *verified* at the next audit that Sturgis had implemented corrective actions related to the 2019 Form 483. (Ex. 15 at 37)

Plaintiffs allege FDA inspectors issued another Form 483 to Sturgis on September 24, 2021. (Compl. ¶ 4) Again the Form 483 stated it "d[id] not represent a final Agency determination regarding your compliance." (Ex. 16 at 1) The Form 483 made five observations: (i) "standing water was observed … under and adjacent to the [redacted] air handling unit, outside the [redacted] door associated with the Dry Blending Room and in the clean-out-of-place (COP) area," and "on the floor below the [redacted]," as well as improper forklift and use near a dryer; (ii) Sturgis did not install a small enough filter on two production lines; (iii) "[p]ersonnel working directly with infant formula … did not wash

---

[3] The Form 483 noted that the Nutrition division's policies required testing 60 samples from each batch. (Ex. 14 at 1) Thus, this observation took issue with how Sturgis implemented the policy.

hands thoroughly in a hand washing facility at a suitable temperature after the hands may have become soiled or contaminated"; (iv) certain pressure and flow sensors were not properly calibrated; and (v) the temperature readings on a pasteurizer were not documented. (*Id.* at 1-3) Plaintiffs cite the observation about handwashing throughout the complaint, characterizing it as asserting "severe safety violations." (Compl. ¶¶ 314, 358) The actual observation concerned a single occasion and a single employee: "on 09/20/2021, in the Mineral Weigh Room, the Processing Operator did not sanitize nor change his gloves after touching non-food contact surfaces," and his "exposed wrists … were observed entering the inside" of an ingredient bag. (Ex. 16 at 2) FDA inspectors did not assert they detected any microbiological contamination associated with this observation, nor did they purport to have observed any other instances of such conduct. (*Id.*) Again, Plaintiffs allege nothing about Abbott's response to this Form 483. Nor do they allege the FDA objected to Abbott's response.

Plaintiffs do not allege with particularity facts showing that any Defendant was aware of either Form 483, other than non-officer Lori Randall, who Plaintiffs allege received a copy of Abbott's response to the Form 483s. (Compl. ¶ 171) Plaintiffs allege an FDA manual says a Form 483 "should be sent to the top management of the firm." (*Id.* ¶ 70) But regardless of who the manual says inspectors *should* send a Form 483 to, the Form 483s here state who they *actually did* send them to: "Patrick A. Cooper, Site Director" in 2019 and "TJ Hathaway, Site Director" in 2021. (Exs. 14 and 16) Neither is a defendant. Moreover, the manual frequently uses "top management" to refer to plant-level officials. (Ex. 17 at Foreword & 5-5 (when beginning a plant inspection, FDA inspectors should "[d]isplay your credentials to the top management official be it the owner, operator, or agent in charge"); *id.* at 5-17 ("If additional Agency personnel accompany you during the inspection, they must show their credentials to the top Management Official upon arrival at the site."))

### 3. Plaintiffs' "Confidential Source" Allegations

Plaintiffs allege they have information from five former Abbott employees. Four are plant-

level employees—three from Sturgis and one who worked at an Abbott facility in Arizona. (Compl. ¶¶ 121-131, 413) None of those four says any Defendant knew of any supposed issue at Sturgis. The fifth former employee, whom Plaintiffs refer to as "FE2," is alleged to have been "a senior level executive in Abbott's Public Affairs and Media Relations departments." (*Id.* ¶ 400) Plaintiffs claim FE2 provided "would have" speculation about Defendants' knowledge. (*E.g.*, *id.* ("the Individual Defendants *would have* been made aware of the February 2021 Whistleblower Complaint") (emphasis added); *id.* ¶ 408 (Abbott's CEO "*would have* been informed of the 483 Reports and Abbott's response") (emphasis added)) Tellingly, Plaintiffs even allege FE2 said "any Form 483 Reports showing Cronobacter positive results *would have* been escalated to Defendant Ford" (*id.* ¶ 409 (emphasis added))—which is odd because *no Form 483 showed a Cronobacter positive result before the recall.* More fundamentally, Plaintiffs do not allege how a media/public affairs employee—even a supposedly "senior" one—knows how *any* regulatory compliance issues are handled, much less how the Sturgis issues actually were handled. Plaintiffs do not allege FE2 had any role regarding—or even saw—the OSHA complaint or the Sturgis Form 483s—or, for that matter, *any* OSHA complaints or Form 483s. They do not allege FE2 actually knows whether any Defendant was aware of the OSHA complaint or Form 483s. They do not allege FE2 ever discussed any matter regarding Sturgis with any Defendant.

## Argument

To state a § 10(b) claim for a fraudulent statement, a plaintiff must allege (among other things) that the defendant made a material misstatement or omission with scienter. *Dura Pharm. v. Broudo*, 544 U.S. 336, 341-42 (2005). To state a § 10(b) claim for fraudulent conduct, a plaintiff must allege that the defendant: "(1) committed a deceptive or manipulative act (2) with scienter, (3) that the act affected the market for securities or was otherwise in connection with their purchase or sale, and (4) that defendants' actions caused the plaintiffs' injuries." *Last Atlantis Cap. v. CBOE*, 455 F. Supp. 2d 788, 793 (N.D. Ill. 2006). Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform

Act ("PSLRA") create a heightened pleading standard for Plaintiffs' claims. Rule 9(b) requires the plaintiff to plead "the who, what, when, where, and how" of the alleged fraud. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). For fraudulent statement claims, the plaintiff must identify each alleged misstatement and allege with particularity why it is misleading. 15 U.S.C. § 78u-4(b)(1). For both types of claims, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); *Tellabs v. Makor Issues & Rights*, 551 U.S. 308, 314 (2007). Plaintiffs' complaint does not meet these pleading burdens.[4]

## I.     Plaintiffs Do Not Plead With Particularity An Actionable Misstatement.

First, Plaintiffs do not allege an actionable misstatement. Each challenged statement is instead (A) immaterial as a matter of law, (B) not alleged to have been false or misleading, and/or (C) a statement of opinion subject to an even higher pleading standard, which Plaintiffs do not meet.[5]

### A.     Most Of The Alleged Misstatements Are Immaterial As A Matter Of Law.

As an initial matter, most of the alleged misstatements are immaterial because they are the type of vague corporate statements investors do not rely on when making investment decisions. As the Seventh Circuit has explained, "non-specific puffery is not actionable under Rule 10b-5." *City of Taylor*, 8 F.4th at 595. Statements that "did not make any concrete assertion" or "expressed only vague optimism" fall into this category. *Id.*; *accord Kuebler*, 13 F.4th at 638 ("Excessively vague, generalized, and optimistic comments—the sorts of statements that constitute puffery—aren't those that a 'reasonable investor,' exercising due care, would view as moving the investment-decision needle—that is, they're not material."). Put another way, statements are immaterial if they "lacked a standard against

---

[4] Plaintiffs also assert a secondary-liability claim under § 20(a). (Compl. Count III) Such claims are dependent on a primary claim, so Plaintiffs' § 20(a) fails because they do not adequately plead a § 10(b) claim. *Pugh v. Trib. Co.*, 521 F.3d 686, 698 (7th Cir. 2008) ("[B]ecause the plaintiffs have not adequately alleged the direct liability of any defendant, their § 20(a) claim was also correctly dismissed.").

[5] Because Plaintiffs challenge a large number of statements, and their allegations often fail for multiple reasons, the attached appendix lists each alleged misstatement and identifies the dismissal arguments applicable to each.

which a reasonable investor could expect them to be pegged." *City of Monroe v. Bridgestone*, 399 F.3d 651, 671 (6th Cir. 2005); *see also W. Palm Beach Firefighters v. Conagra*, 495 F. Supp. 3d 622, 653-54 (N.D. Ill. 2020) (When a statement does not "convey[] something specific, measurable, or concrete," it is "simply too vague to be material."). This rule has special force in fraud-on-the-market cases like this one (Compl. ¶ 452), because the market as a whole can be expected to discount statements that lack specificity even more readily than individual investors. *City of Monroe*, 399 F.3d at 676; *In re Midway Games Sec. Litig.*, 332 F. Supp. 2d 1152, 1164-65 (N.D. Ill. 2004).

### 1.    Statements Regarding Abbott Product Quality/Safety

Several of the challenged statements discuss product quality or safety only generally or in non-specific terms that courts identify as marketing rhetoric. (Compl. ¶¶ 313, 317, 319, 329, 339, 343, 351, 353, 355)[6]  This includes statements from Abbott's website like:

- "So, from our ingredients to our packaging, our employees are committed to bringing you safe, superior-quality products you can trust."  (*Id.* ¶ 317)

- Abbott is "fully committed to delivering the highest standards of quality, safety, and performance."  (*Id.* ¶ 329)

- "We produce and deliver safe, effective products that people trust."  (*Id.* ¶ 351)

It also includes Defendant Ford's statement that sustainability is "a natural extension of our purpose—helping people live healthier, fuller lives.  We pursue this mission very deliberately through our business strategies and processes.  Abbott always takes the long view." (*Id.* ¶ 339)  And it includes the *only* challenged statement by Defendant Randall: "We're customer centric.  It's about the new mom or the caretaker or someone in the hospital using our products." (*Id.* ¶ 355)

These general statements are not about Sturgis or even infant formula.  They are non-specific statements about the business, each of which is immaterial because it does not contain any standard

---

[6] The brochure alleged in ¶ 313 shows it was made in June 2020 (Ex. 18), so is also not actionable because it was made before the putative class period. *E.g.*, *City of Livonia v. Boeing*, 2010 WL 2169491, *4 (N.D. Ill. May 26, 2010) (statement "not actionable because it was issued before the start of the … class period.").

"against which a reasonable investor could expect them to be pegged." *City of Monroe*, 399 F.3d at 671; *see also In re Ford Motor Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) (affirming dismissal as immaterial claim about statements that Ford "want[s] to make customers' lives … safer," and was "dedicated" to "delivering … safer vehicles to the consumer"); *Howard v. Arconic*, 395 F. Supp. 3d 516, 549, 579 (W.D. Pa. 2019) (dismissing § 10(b) claim because statements such as "[w]e supply and use safe and reliable products and services" were "aspirational" and "were not a guarantee that no safety issues would ever occur"). Courts dismiss securities claims about statements lacking specificity even when the statements concerned the particular product at issue (which, again, the statements here did not). For example, Judge Tharp's § 10(b) decision about the Boeing 737 MAX accidents addressed the statement that "the 737 MAX is safe and safety is a core value for us at Boeing." *In re Boeing Aircraft Sec. Litig.*, 2022 WL 3595058, *9 (N.D. Ill. Aug. 23, 2022). Although the statement addressed the specific product at issue, the court still held it "amount[ed] to nonmaterial puffery and opinion." *Id.* at *7.[7]

### 2. Statements About Regulatory Compliance And Code Of Conduct

Other immaterial statements concern compliance with ethics, policies, rules, or regulations. (Compl. ¶¶ 313, 325, 327, 343, 347, 349, 351, 353) This category encompasses statements such as:

- "We are committed to marketing these products ethically and ensuring that our practices comply with all local laws and regulations." (*Id.* ¶ 347)

- "We have well-established systems for ensuring that conduct at every level of the business conforms to our Global Infant Formula Marketing Policy, as well as the laws of the countries in which we operate." (*Id.*)

The category also includes general statements from Abbott's code of conduct, such as: "Abbott does not tolerate illegal or unethical behavior in any aspect of our business and that employees are required to ask questions and/or report any concerns." (*Id.* ¶ 349)

---

[7] Similarly vague, aspirational quality messages have also been held nonactionable in consumer-products litigation because reasonable consumers (like reasonable investors) do not rely on them. *E.g.*, *Van Noppen v. Inner-Workings*, 136 F. Supp. 3d 922, 941 (N.D. Ill. 2015) ("defendant touted its 'intense focus' and 'vigilance' in executing operational improvements").

Courts routinely reject broad statements about regulatory compliance in § 10(b) cases. "It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'" *City of Pontiac Policemen v. UBS*, 752 F.3d 173, 183 (2d Cir. 2014) (affirming dismissal of a claim about the statement that defendant "complied with all applicable laws"). Thus, Judge Ellis recently held that such statements "are aspirational, general prohibitions on employee behavior and therefore not actionable." *Heavy & Gen. Laborers v. Fifth Third Bancorp*, 2022 WL 1642221, *18 (N.D. Ill. May 24, 2022); *see also In re Braskem Sec. Litig.*, 246 F. Supp. 3d 731, 744, 755 (S.D.N.Y. 2017) (dismissing claim about "[c]orporate governance principles" and "conformity with legal and regulatory bodies"). This principle applies to statements that a company complies with food-safety laws. For example, *Ong v. Chipotle Mexican Grill*, 294 F. Supp. 3d 199 (S.D.N.Y. 2018), dismissed a claim about the statement that Chipotle had "food safety programs … designed to ensure that we comply with applicable federal, state and local food safety regulations." *Id.* at 232. The court held the statement "did not amount to a guarantee with regard to the efficacy of Chipotle's food-safety practices." *Id.*

These principles support dismissing Plaintiffs' claims about statements that described Abbott's ethics or legal compliance in general or aspirational terms. Like Chipotle, Abbott's statements "did not amount to a guarantee with regard to the efficacy of" Abbott's compliance practices. *Id.* That is particularly true given the context in which Abbott's statements were made. Abbott's SEC Form 10-Ks warned investors that Abbott was *not* claiming it would never have manufacturing problems, explaining: "If problems arise during the production of a lot or batch of product, those products may have to be discarded. If problems are not discovered before the product is released to the market, recall and product liability costs may also be incurred." (Ex. 2 at 10)

The same principle holds for statements in Abbott's code of conduct. SEC regulations require each registrant to "[p]ost the text of such code of ethics on its Internet website." 17 C.F.R.

13

§ 229.406(c)(2). Plaintiffs' claim amounts to an argument that any corporation that follows the SEC requirements is liable for securities fraud if anyone at the company ever violates the code of conduct. Courts have rejected this opportunistic theory: "[I]t simply cannot be that every time a violation of that code [of conduct] occurs, a company is liable under federal law for having chosen to adopt the code at all, particularly when the adoption of such a code is effectively mandatory." *Ferris v. Wynn Resorts*, 462 F. Supp. 3d 1101, 1121-22 (D. Nev. 2020); *see also Braskem*, 246 F. Supp. 3d at 755 (similar).

In *Chandler v. Ulta Beauty*, 2022 WL 952441 (N.D. Ill. Mar. 30, 2022), Judge Pacold explained that statements in codes of conduct are non-actionable because it is "inherently aspirational" for a code to describe what the company "expects," or what employees "should" or "should not" do. *Id.* at *9; *accord Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (similar); *Retail Wholesale & Dep't Store Union v. Hewlett-Packard*, 845 F.3d 1268, 1276 (9th Cir. 2017) (codes of conduct "express[] opinions as to what actions are preferable, as opposed to implying that all staff, directors, and officers always adhere to its aspirations"); *Das v. Rio Tinto*, 332 F. Supp. 3d 786, 806 (S.D.N.Y. 2018) (similar). Likewise, in *In re Yum! Brands Sec. Litig.*, 73 F. Supp. 3d 846 (W.D. Ky. 2014), a case arising out of food-safety problems at KFC, the court dismissed claims based on KFC's code of conduct, which stated: "as an employee you are expected to immediately report any problem with food safety to your supervisor or to the next level of management." *Id.* at 855, 864. The court explained: "The adoption of a code of conduct does not imply that a corporation or its employees always comply with the code's guidelines," as such codes only "state how a corporation or its employees ought to behave, not how they actually behave." *Id.* at 864. The same is true here. Abbott's code is clear that it is an aspirational document, explaining at the beginning that "Our Code lays out our values and our principles, so every Abbott person around the world understands the expectations and requirements that guide the actions we take on Abbott's behalf." (Ex. 19 at 2) The context is clear: The code is a statement to employees ("every Abbott person around the world …") of the Company's expectations of them.

14

Finally, and independent of the immateriality argument, Plaintiffs do not plead facts establishing that any of these statements were inaccurate. For example, they do not plead Abbott did not "extensively test each batch to ensure it meets our quality standards." (Compl. ¶ 325) Consequently, in addition to being immaterial, Plaintiffs do not plead the statements were fraudulent.

### 3. Statements Regarding Manufacturing Facilities And Processes

Still other immaterial statements concern Abbott's manufacturing facilities or processes. (Compl. ¶¶ 319, 322, 323, 325, 329, 332, 334, 341, 343, 345, 362) Such statements are immaterial because they too are classic aspirational statements that investors do not rely on.

*Manufacturing Processes:* Abbott's online "Quality Promise" stated that "our high-tech quality processes ensure safety and quality throughout every stage of the manufacturing process." (*Id.* ¶ 319) Abbott's online Sustainability Report stated that Abbott has a "tightly controlled manufacturing process" and that it reviews its "multicomponent model and proprietary metrics" at least annually "to ensure they continue to assess relevant quality and compliance risks." (*Id.* ¶¶ 341, 343) Precedent establishes that such non-concrete statements are immaterial. *E.g., In re AstraZeneca Sec. Litig.*, 2022 WL 4133258, *8 (S.D.N.Y. Sept. 12, 2022) ("high scientific and ethical standards" and "the rigor of manufacturing processes" were immaterial).

*Clean Facilities:* Plaintiffs allege that Abbott's online "Quality Promise" stated:

> Our facilities are designed and maintained to the highest Good Manufacturing Practice standards, which are recognized globally. All employees follow strict hygiene measures, such as wearing specialized uniforms, facemasks and sanitized gloves.

(Compl. ¶ 322) Plaintiffs contend this statement was false or misleading because Sturgis purportedly suffered "numerous and significant CGMP violations," such as improper seam testing and "failing to practice proper handwashing procedures." (*Id.* ¶ 323) Plaintiffs' position would effectively turn every violation of CGMP into securities fraud. But reasonable investors would not understand Abbott's

"Quality Promise" as guaranteeing compliance. No company with 115,000 employees and 90 manufacturing facilities could make such a representation. Even more, Abbott's other disclosures cautioned Abbott was *not* claiming its employees always met applicable standards. Abbott's Form 10-Ks warned that "no assurance can be given that Abbott will remain in compliance with applicable FDA and other regulatory requirements once approval or marketing authorization has been obtained for a product. These requirements include, among other things, regulations regarding manufacturing practices." (*Id.* ¶ 334); *City of Taylor*, 8 F.4th at 596 (statement that merger "integration is progressing as planned" was "not unqualified: an SEC Form 10-Q filed that same month warned that absorbing Motorola's assets may not be 'performed timely and effectively'"). It is not unusual for a large manufacturing company to have occasional quality issues, and investors knew Abbott was no different: Public documents showed Abbott had received a warning letter from the FDA regarding cardiac defibrillator devices in 2017. (Ex. 20) Because Abbott had, like many companies, had a regulatory issue, no reasonable investor would have understood Abbott's statements to say that such issues would never arise. *E.g.*, *Boeing*, 2022 WL 3595058 at *19 ("Because all that information was public knowledge, only unreasonable investors would find Muilenburg's statement about Boeing's core values meaningful to the total mix of information").

**Product Testing:** Plaintiffs claim the online "Quality Promise" also stated: "Before releasing products for sale, we extensively test each batch to ensure it meets our quality standards, which are among the highest in the world. And, we ensure that our products comply with all global and local regulations." (Compl. ¶ 325) Plaintiffs allege Abbott's online Global Sustainability Report stated: "We monitor and verify microbiology, packaging integrity, and nutrient and lot control. We complete extensive finished product testing before releasing it for commercial distribution." (*Id.* ¶¶ 341, 345)

These statements are too vague for reasonable investors to have relied on them. Plaintiffs allege the statements were misleading because Sturgis employees purportedly performed improper

16

seam tests, did not "test[] a representative sample of its infant formula products," and used supposedly improper time-code removals when they identified product that was out of specification. (*Id.* ¶ 315) But the contested statements made no specific assertions about what tests Abbott conducts. And the "Quality Promise" and Global Sustainability Report both contain numerous other optimistic marketing-type statements that investors understand is "all about promoting [the company], its brand, and its products." *In re Mylan Sec. Litig.*, 2023 WL 3539371, *10 (W.D. Pa. May 18, 2023) (statement that "Mylan uses advanced testing and monitoring systems to assure product adheres to testing acceptance criteria that are in alignment with requirements established by standard-setting organizations around the world" was non-actionable). The statements are "too vague to mislead," because they do not "identify specific requirements or standards" regarding what tests were conducted. *See Argabright v. Rheem Mfg.*, 201 F. Supp. 3d 578, 608 n.16 & 609 (D.N.J. 2016) (holding in a consumer case that the statements "routinely tested and certified" and "manufacturing process is rigorously monitored and measured" were immaterial). At most, these statements convey that Abbott had processes for testing its products—but they do not specify what those processes were, what exact tests Abbott performed, or how often Abbott performed them. Plaintiffs also do not allege with particularity that these statements were inaccurate—that Abbott did not conduct testing of its products or did not, for example, "monitor … lot control." Plaintiffs' allegations are therefore deficient on that ground as well.

**B.     Plaintiffs Do Not Plead With Particularity Facts Showing Any Statement Of Fact Was False Or Misleading.**

Plaintiffs also fail to allege with particularity facts showing that any statement of fact was false or misleading. A statement is false if it is literally inaccurate. A statement is misleading only if an omitted fact "alters the meaning of the statement" that was actually made. *McDonald v. Kinder-Morgan*, 287 F.3d 992, 998 (10th Cir. 2002). For example, the Seventh Circuit's *City of Taylor* decision considered a claim that a corporation's disclosure of estimated cost savings from a merger was rendered misleading by the corporation's failure to also disclose ongoing costs of the merger. 8 F.4th at 595.

The Seventh Circuit rejected the claim, reasoning that "the one-time expenses of integration are cate-gorically distinct from recurring savings gained by melding similar businesses." *Id.* It further explained that "the Securities Exchange Act does not impose a 'duty of total corporate transparency.'" *Id.*

Relatedly, a plaintiff cannot state a § 10(b) claim merely by alleging a company failed to disclose a material fact. "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 44 (2011). "Disclosure is required under these provisions only when necessary to make … statements made, in the light of the circumstances under which they were made, not misleading." *Id.* "Mere silence about even material information is not fraudulent absent a duty to speak." *Stransky v. Cummins Engine*, 51 F.3d 1329, 1331 (7th Cir. 1995). Here, for the few statements of fact Plaintiffs claim were fraudulent, they fail to plead with particularity facts showing the statement was inaccurate or misleading.

***Proactive, Voluntary Recall:*** Plaintiffs allege Abbott's statements describing the Sturgis recall as a "proactive, voluntary recall" were fraudulent because "the Company failed to disclose that the FDA demanded the recall days earlier." (Compl. ¶¶ 360-61, 369) This assertion does not withstand scrutiny. First, there can be no dispute the recall was voluntary. FDA regulations establish that a "[r]ecall is a voluntary action." 21 C.F.R. § 7.40(a). Even more, Plaintiffs themselves allege that both the FDA and the White House described the Sturgis recall as voluntary. (Compl. ¶ 188 (FDA), ¶ 239 (White House)) Second, Abbott's statements were not misleading for not saying the FDA asked the Company to voluntarily recall its product. *The same day* as Abbott's announcement of the recall, the FDA announced it had an "ongoing investigation" of Sturgis. (*Id.* ¶ 184) So investors indisputably knew the FDA was involved with the issues at Sturgis and communicating with Abbott about them. *E.g.*, *Chu v. Sabratek*, 100 F. Supp. 2d 827, 834 (N.D. Ill. 2000) ("A plaintiff cannot credibly claim to be misled by a company's attempt to hide negative information when that same information is publicly available via alternate channels."). In any event, whether the recall was voluntary is "distinct" from

18

what prompted the voluntary recall. *City of Taylor*, 8 F.4th at 595. Abbott's statements did not purport to explain all factors that precipitated the voluntary recall, so no reasonable investor would have concluded from the statements that Abbott made its decision independent of the FDA.

*Non-Product Contact Areas:* Abbott's statements about the Sturgis recall also noted that, during its testing at Sturgis, Abbott "found evidence of *Cronobacter sakazakii* in the plant in non-product contact areas." (Compl. ¶¶ 360, 372) Plaintiffs allege these statements were fraudulent because the Form 483 issued after the recall states "Cronobacter was detected on a 'scoop hopper' that was 'utilized to feed scoops, which are placed directly inside infant formula containers that contact product.'" (*Id.* ¶ 361) Scoops are the little ladles that come in cans of formula; the scoop *hopper* is the container at the manufacturing facility that holds the scoops before they are placed in formula cans. The Form 483 that Plaintiffs rely on indicates the positive scoop hopper sample was from the "top, clear cover" of the scoop hopper (not inside it where the scoops are), which the Form 483 states is "a zone two surface." (Ex. 21 at 1) The FDA defines "Zone 2" as "*[n]on-food-contact surfaces* in close proximity to food and food contact surfaces." (Ex. 22 at 35, emphasis added; Ex. O at 4-26 (same)) Thus, the Form 483 itself *contradicts* Plaintiffs' claim that Abbott's statements were inaccurate.

*Test Results:* Abbott's February 17, 2022 announcement of the recall stated that (i) "no distributed product has tested positive for the presence of either of these bacteria," (ii) "retained samples related to the three complaints for Cronobacter sakazakii tested negative for Cronobacter sakazakii," and (iii) "Abbott's testing of finished product detected no pathogens." (Compl. ¶ 360) Plaintiffs assert this statement was fraudulent because FDA inspectors stated that as of January 2022 "Abbott did not test retained samples when the Company investigated a complaint of an infant death from Cronobacter." (*Id.* ¶ 361; Ex. 21 at 6-7) But the allegation that Abbott had not conducted testing as of January 2022 does not plead with particularity, or even logically imply, that Abbott had not conducted testing by February 17, 2022. Thus, Plaintiffs again fail to allege the statement was inaccurate.

Abbott's March 22, 2022 statement indicated that no Cronobacter "was found in any of our testing of products distributed to consumers." (*Id.* ¶ 372)  Plaintiffs claim this statement was fraudulent based on "plant officials knowingly falsifying testing records" and the 2019 Form 483 challenging Sturgis's methodology for pulling test samples. (*Id.* ¶ 373)  But these allegations do not show Abbott's statement was inaccurate.  Plaintiffs do not allege that any supposedly falsified testing concealed positive Cronobacter results, nor that Sturgis had not adopted the FDA inspector's preferred methodology for pulling samples for Salmonella testing years earlier.  Thus, their allegations do not show the statement was fraudulent.

***Congressional Testimony:*** On May 25, 2022, Defendant Calamari testified before a Congressional subcommittee that Abbott "became aware of the whistleblower complaint in the end of April, when it was made public by Congress…. I became aware of it in the April timeframe, when it was made public by Congress." (*Id.* ¶ 374)  Plaintiffs allege this testimony was fraudulent because Abbott knew about the *February 2021 OSHA* complaint before April 2022. (*Id.* ¶ 376)  But Calamari was not discussing the February OSHA complaint.  As Plaintiffs allege, the so-called whistleblower made *multiple* complaints, including the OSHA complaint in February 2021 and a complaint to the FDA in October 2021. (*Id.* ¶¶ 4, 99)  Calamari's testimony responded to a question when he became aware of the *October 2021 FDA* complaint.  A Representative asked Calamari questions about the September 2021 Form 483.  The colloquy relevant to Plaintiffs' allegations followed immediately after:

> *Rep. Michael C. Burgess:* Well, ok, fair enough.  So then *four weeks goes by* and a whistleblower complaint *is delivered to the FDA.*  And I – I presume they contacted you straightway after they got the whistleblower complaint, is that correct?
>
> *Christopher J. Calamari:* Representative, no.  We became aware of the whistleblower complaint in the end of April *when it was made public by Congress.*
>
> *Rep. Michael C. Burgess:* So that time lag between *October* and February was internal *to the FDA* and not part of your normal quality assurance process?
>
> *Christopher J. Calamari:* Correct. I became aware of it in the April timeframe when it was made public by Congress.

(Ex. 23 at 180, emphasis added)  Thus, the transcript shows Calamari was asked about the October 2021 FDA complaint.  Plaintiffs do not allege any facts showing Calamari (or anyone at Abbott) learned of the October 2021 FDA complaint before April 2022, just as Calamari testified.

*Certification Of SEC Filings:* Defendants Ford and Funck submitted certifications with Abbott's Form 10-Ks, attesting: "Based on my knowledge, this report does not contain any untrue statement of a material fact…."  (Compl. ¶¶ 336, 366, 388)  First, Plaintiffs fail to identify any statement in the Form 10-Ks that was untrue.  The only statement they even try to claim was untrue is Abbott's opinion that its facilities were "deemed suitable" for their intended purposes.  (*Id.* ¶ 367)  As explained below, Plaintiffs do not plead facts showing that opinion was fraudulent.  *Infra* at 23.  Second, Ford and Funck certified only "based on [their] knowledge," meaning that "the falsity of the statement is entirely dependent on what [they] knew."  *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 402 (S.D.N.Y. 2016); *Das*, 332 F. Supp. 3d at 812 ("based on [my] knowledge" is "an important qualification").  Courts routinely reject such claims where "Plaintiffs have failed to allege any facts showing that [they] did not believe what [they] said."  *Sanofi*, 155 F. Supp. 3d at 402; *see also Chandler*, 2022 WL 952441 at *22 ("even if Ulta's SEC filings did contain material misstatements, it was not false for Dillon and Setterson to represent that they were unaware of any material misrepresentations").  Finally, the 2021 Form 10-K was filed the day after Abbott announced the Sturgis recall.  (Compl. ¶ 366)  Thus, by that time, investors were already aware of a serious issue at Sturgis.  *Boeing*, 2022 WL 3595058 at *19 (statement was not misleading, in light of "total mix of information" already available).  Therefore, Plaintiffs do not plead facts showing that Ford's or Funck's certifications were false or misleading.[8]

---

[8] Plaintiffs are not clear whether they allege the post-recall statement in ¶ 371 was fraudulent; it has no bold or italics.  To the extent they are intending to allege the statement was fraudulent, much of the statement is plainly immaterial (for example, "Abbott is committed to upholding the highest standards for manufacturing of all nutrition products") and Plaintiffs do not plead the remainder was inaccurate (for example, "We have already begun implementing corrective actions and enhancements at the facility….").

### C.    Plaintiffs Do Not Plead Any False Or Misleading Statement Of Opinion.

Several alleged misstatements are statements of opinion for which Plaintiffs fail the even more exacting pleading test the Supreme Court articulated in *Omnicare v. Laborers District Council*, 575 U.S. 175 (2015). (Compl. ¶¶ 332, 357, 362) *Omnicare* explained that "a statement of opinion is not misleading just because external facts show the opinion to be incorrect." 575 U.S. at 188. Rather, to plead a misleading opinion, a plaintiff must allege that either (1) the maker of the statement did not sincerely believe the opinion; or (2) the opinion did not "fairly align[] with the information in the issuer's possession at the time." *Id.* at 188-89. To make the latter claim, a plaintiff "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 194. Plaintiffs' allegations are insufficient.

First, at a January 2022 healthcare conference, Defendant Ford stated:

> I would say, if you look at 2021 across every one of our businesses, we either grew markets or we took share, we performed above market. So, I like the businesses that Abbott is involved in.… I like the performance of the team and the execution that we've been able to do.… I think we are in a great shape with the businesses that we have."

(Compl. ¶ 357) This statement is not only immaterial (*supra* at 10-11), but it is also a statement of opinion, and independently fails on that basis. Plaintiffs allege Abbott's business was not "in great shape" (Compl. ¶ 357), but they plead no facts showing Ford did not sincerely hold the opinion he expressed or that the information he had did not fairly align with it. *Gallagher v. Abbott Labs.*, 269 F.3d 806, 811 (7th Cir. 2001) ("The statement about past performance was accurate, and the plaintiffs have not given us any reason to doubt that White honestly believed that similar growth would continue, or that White honestly believed 'Abbott's diagnostics pipeline [to be] fuller than ever before.'"). More than that, Ford's statement concerned Abbott's financial performance in 2021. Plaintiffs do not allege facts showing anything at Sturgis affected Abbott's 2021 financial performance. *City of Taylor*, 8 F.4th

at 595 (a statement on one topic is not rendered misleading by failure to disclose facts about a "categorically distinct" topic).

Second, Abbott's 2020 and 2021 Form 10-Ks stated: "Abbott's facilities are deemed suitable and provide adequate productive capacity." (Compl. ¶¶ 332, 362) This statement was included to comply with Instruction 1 of SEC Regulation S-K, Item 102, which requires registrants to "reasonably inform investors as to the suitability, adequacy, productive capacity, and extent of utilization of the principal physical properties of the registrant." 17 C.F.R. § 229.102. Plaintiffs claim Abbott's statements were fraudulent because—in their own subjective assessment—Sturgis was "not suitable." (Compl. ¶ 333) Not only did this statement address Abbott's facilities companywide—90 manufacturing facilities plus many other facilities—but it is a statement of opinion: whether the facilities are "suitable" for their intended purposes. Plaintiffs do not plead that the opinion was not sincerely held or that the totality of the information possessed by those who reached that opinion for Abbott did not fairly align with the opinion. Plaintiffs are attempting to parlay Item 102 into a requirement that registrants must disclose all manufacturing challenges that might in the future cause regulatory events. There is no support for such an interpretation of Item 102. *City of Taylor*, 8 F.4th at 595 ("As we have held, the Securities Exchange Act does not impose a 'duty of total corporate transparency.'").

### D. Plaintiffs Do Not Plead Particularized Facts Showing An Actionable Violation Of Regulation S-K.

Plaintiffs also claim Abbott's SEC filings during the putative class period did not comply with Regulation S-K Items 303, 105, and 307.[9] Their allegations do not state a claim under § 10(b).[10]

As a threshold matter, alleging a failure to comply with Regulation S-K does not independently

[9] Plaintiffs actually allege Abbott violated Item 503, not Item 105. (Compl. ¶ 382) However, Regulation S-K was re-numbered in 2019, moving Item 503 to Item 105. *Rubinstein v. Credit Suisse*, 457 F. Supp. 3d 289, 300 (S.D.N.Y. 2020). Defendants construe Plaintiffs' Item 503 allegations as relating to Item 105.

[10] Plaintiffs do not assert there is a private right of action under Regulation S-K itself. (Compl. ¶¶ 462-86) Nor would such an argument be viable. *Oran v. Stafford*, 226 F.3d 275, 287 (3d Cir. 2000) (Alito, J.).

23

state a § 10(b) claim.  To plead a § 10(b) claim, a plaintiff must allege the defendant made a material misstatement.  *Matrixx Initiatives*, 563 U.S. at 44.  And the standard for 10(b) materiality differs from Regulation S-K's disclosure standards.  *E.g.*, *In re Nvidia Sec. Litig.*, 768 F.3d 1046, 1054-55 (9th Cir. 2014).  Thus, every appellate court to consider the issue has rejected the argument that alleging a failure to comply with Regulation S-K, without more, states a § 10(b) claim.  *Id.* at 1056 ("Item 303 does not create a duty to disclose for purposes of Section 10(b) and Rule 10b-5."); *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102 (2d Cir. 2015) ("The failure to make a required disclosure under Item 303 … is not by itself sufficient to state a claim for securities fraud under Section 10(b)."); *Oran*, 226 F.3d at 288; *see also Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 909 (N.D. Ill. 2001); *Kriendler v. Chem. Waste Mgmt.*, 877 F. Supp. 1140, 1157 (N.D. Ill. 1995).  Instead, a plaintiff can only plead a § 10(b) claim based on a failure to comply with Regulation S-K by alleging with particularity facts showing the violation made the SEC filings in question materially misleading.  *Stratte-McClure*, 776 F.3d at 102. Plaintiffs here do not satisfy that standard—they do not plead a violation of Regulation S-K at all.

   *Item 303:*  Item 303 requires registrants to disclose "known trends or uncertainties" that "are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(b)(2)(ii).  Plaintiffs allege Item 303 required Abbott to disclose "that the Company's Sturgis facility suffered from long-standing, persistent, serious, and pervasive manufacturing, maintenance, and quality control deficiencies."  (Compl. ¶ 381)  But Plaintiffs' allegation is a characterization, not a fact—and it is not supported by any allegation of fact. Plaintiffs also do not allege Abbott knew any undisclosed issues at Sturgis were likely to have a material impact on companywide sales, revenues, or income from continuing operations.  Indeed, unless someone knew in advance that Sturgis was likely to suspend formula production—which Plaintiffs do not allege—there would be no reason to expect a material impact on those metrics.  *E.g.*, *Plumbers & Pipefitters*, 679 F.3d at 955 ("Knowing of 'problems,' which are common, differs from knowing that a

24

facility must be closed and some of its products recalled."). History shows that receiving a Form 483 does not usually lead to a facility's closure. *E.g., In re Impax Labs. Deriv. Litig.*, 2015 WL 5168777, *1-2 (N.D. Cal. Sept. 3, 2015) (describing seven Form 483s and a warning letter over five years before further FDA action). The FDA issues thousands of Form 483s each year. *Supra* at 6.

  ***Item 105:*** Item 105 requires registrants to disclose "the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a). Abbott's SEC Form 10-Ks complied, disclosing, among many other risks:

- "Abbott is subject to numerous governmental regulations and it can be costly to comply with these regulations and to develop compliant products and processes." (Compl. ¶¶ 334, 364, 383)

- "In addition, no assurance can be given that Abbott will remain in compliance with applicable FDA and other regulatory requirements once approval or marketing authorization has been obtained for a product." (*Id.*)

Plaintiffs allege these disclosures were both misleading and did not comply with Item 105.

  First, Plaintiffs allege the risk disclosures were misleading because Abbott did not disclose that "the risks had already transpired" at Sturgis. (*Id.* ¶ 335) But even if there were problems at Sturgis, it was still possible that other Abbott facilities could have regulatory issues in the future. Item 105 *required* Abbott to disclose such risks, and complying with that requirement does not imply the risk has not occurred anywhere in the Company. *Bondali v. Yum! Brands*, 620 F. App'x 483, 491 (6th Cir. 2015) ("a reasonable investor would be unlikely to infer anything regarding the current state of a corporation's … operations from a statement intended to educate the investor on *future* harms"); *Wochos v. Tesla*, 985 F.3d 1180, 1195-96 (9th Cir. 2021) (rejecting a similar claim because "these challenged statements contain no explicit or implicit representation that Tesla had *not* already experienced such issues"). Notably, Abbott made *the same* risk disclosures in 2017 despite receiving an FDA warning letter, which was public and asserted such an issue had occurred. (Ex. 24 at 9; Ex. 20) Thus, no reasonable investor would have understood Abbott's risk disclosures to imply no such issues had

"transpired." Moreover, Abbott's disclosure that it might fail to comply with applicable regulations is immaterial as a matter of law. As the Seventh Circuit has explained, "[q]uality-control issues at pharmaceutical and medical-device producers are endemic." *Plumbers & Pipefitters*, 679 F.3d at 956. Restating that risk is not something new to investors. *E.g., Yum! Brands*, 73 F. Supp. 3d at 861 ("[S]tatements of the risk and uncertainty presented by food safety problems are not the type of statements that a reasonable investor would find important in the total mix of available information.").

Second, Plaintiffs do not plead with particularity facts showing Abbott's risk disclosures failed to comply with Item 105. Plaintiffs do not plead that the individuals who prepared or approved the disclosures considered any then-known issues at Sturgis to be material factors making investment in the overall company risky at the time. Even more, each Form 10-K cautioned that "risks Abbott currently considers immaterial could also affect Abbott's actual results." (Ex. 25 at 9; Ex. 2 at 9) As a result, the alleged misstatements were not misleading because investors knew that risks Abbott did not believe were material might nonetheless later have a material impact. At bottom, courts have rejected attempts to transform Regulation S-K into a requirement to list every matter that might in the future create a problem. *E.g., City of Pontiac*, 752 F.3d at 184 (holding a prior version of Item 503 was "not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing"); *Okla. Law Enf. v. Papa John's*, 517 F. Supp. 3d 196, 210 (S.D.N.Y. 2021) (rejecting § 10(b) claim based on Item 503 where the plaintiffs "pointed to nothing more than unadjudicated wrongdoing and an increased risk").

***Item 307:*** Item 307 requires registrants to "[d]isclose the conclusions of the registrant's principal executive and principal financial officers, or persons performing similar functions, regarding the effectiveness of the registrant's disclosure controls and procedures." 17 C.F.R. § 229.307. Abbott complied, disclosing Defendants Ford's and Funck's conclusions that Abbott's "disclosure controls and procedures were effective." (Compl. ¶ 387) Plaintiffs assert these statements were false. (*Id.*

¶ 389)  However, "[d]isclosure controls" mean "controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Act (15 U.S.C. 78a et seq.) is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms."  17 C.F.R. § 240.13a-15(e).  Plaintiffs allege no facts about Abbott's processes for preparing its SEC disclosures.  They *assert* the controls "were poorly designed and 'ineffective'" (Compl. ¶ 387), but "rather than stating allegations about the existing or missing controls, the plaintiffs argue that the controls *must* have been weak *because* a fraud actually occurred," which is not sufficient.  *Pugh*, 521 F.3d at 694 (emphasis in original); *see also Higginbotham v. Baxter Int'l*, 495 F.3d 753, 759 (7th Cir. 2007) (similar); *Arora v. HDFC Bank*, 2023 WL 3179533, *7 (E.D.N.Y. May 1, 2023) (rejecting claim regarding internal controls conclusion where "Plaintiff has not said anything specific about the nature of the alleged deficiencies in HDFC's control environment").  Furthermore, Ford's and Funck's conclusions about Abbott's disclosure controls are their opinions, so they are subject to the heightened standard articulated in *Omnicare.  Supra* at 22; *Fogel v. Vega*, 759 F. App'x 18, 24 (2d Cir. 2018) ("statements concerning Wal-Mex's internal controls" must "meet the standard for actionable opinion statements under *Omnicare*"); *Lachman v. Revlon*, 487 F. Supp. 3d 111, 134-35 (E.D.N.Y. 2020) (Sarbanes-Oxley certifications "were statements of opinion").  Plaintiffs do not allege any facts showing their conclusions were not sincerely held or that the information Ford or Funck had regarding those controls did not fairly align with their conclusions.

## II.  Plaintiffs Do Not Plead Particularized Facts Stating A Rule 10b-5(a) Or (c) Claim.

Separate from their claim of fraudulent statements, Plaintiffs assert § 10(b) liability for fraudulent conduct, ostensibly in violation of SEC Rule 10b-5(a) and (c) (often called "scheme liability"). (Compl. Count II)  Plaintiffs fail to plead with particularity conduct necessary to support such a claim. The supposed conduct to defraud investors, according to Plaintiffs, was conduct at Sturgis, including "[f]ailing to properly staff the Sturgis plant" and failing "to devote needed resources"—conduct that

is not facially deceptive at all. (*Id.* ¶ 474) Other supposedly fraudulent conduct is alleged to have been aimed at regulators or even higher-level Abbott employees. (*Id.* ("deceiving the FDA investigators during the 2019 audit," and "falsifying … records"))

First, the argument that the conduct Plaintiffs allege violates *the securities laws* is barred by the Supreme Court's decision in *Stoneridge Investment Partners v. Scientific-Atlanta*, 552 U.S. 148 (2008), which held that conduct-based liability must be based on conduct that occurred in the "securities markets," not "the realm of ordinary business operations." *Id.* at 161. The Seventh Circuit applied *Stoneridge* in *Pugh v. Tribune Co.* There, an individual, Louis Sito, had pled guilty to criminal charges for having "knowingly signed false circulation audits" for two newspapers. 521 F.3d at 696. The plaintiffs alleged a § 10(b) claim for fraudulent conduct, alleging "it was 'foreseeable' that this scheme would result in improper revenue which, in turn, would be reflected in Tribune's published financial statements." *Id.* *Pugh* rejected the claim, holding "the plaintiffs' allegations of so-called 'scheme liability' are insufficient under the Supreme Court's recent decision in *Stoneridge*." *Id.* "*Stoneridge* indicates that an indirect chain to the contents of false public statements is too remote to establish primary liability." *Id.* at 697. The defendant's false certification audits were insufficient to plead a § 10(b) conduct claim because he "had no role in preparing or disseminating Tribune's financial statements or press releases." *Id.*

*Stoneridge* and *Pugh* apply with full force here. If Plaintiffs' allegations were sufficient, *any* regulatory violation—under federal, state, or foreign law—or even mismanagement by a public company would *also* be securities fraud. This is the very result *Stoneridge* rejected. As the Supreme Court explained: "Were the implied cause of action to be extended to the practices described here … there would be a risk that the federal power would be used to invite litigation beyond the immediate sphere of securities litigation and in areas already governed by functioning and effective state-law guarantees." *Stoneridge,* 552 U.S. at 161; *see also Pugh*, 521 F.3d at 697 (conduct liability "does not reach all commercial transactions that are fraudulent and affect the price of a security in some attenuated way"). Rule 10b-

5(a) and (c) cannot be "construed so broadly as to convert every common-law fraud that happens to involve securities into a violation," even if the purported fraud "diminished the value" of securities. *Gallup v. Clarion Sintered Metals*, 489 F. App'x 553, 557 (3d Cir. 2012).

Second, and independently, Plaintiffs do not allege a claim for fraudulent conduct because they fail to allege with particularity which individuals purportedly engaged in the supposedly fraudulent conduct. For example, no Individual Defendant is alleged to have "deceiv[ed] … FDA investigators" or to have made Sturgis staffing decisions. Nor is there any allegation showing anyone else at Abbott intentionally engaged in the alleged misconduct for the purpose of defrauding investors. Because the complaint is "[w]ithout an explanation as to who played what role in the alleged scheme," Plaintiffs' allegations are deficient. *Desai v. Gen. Growth Props.*, 654 F. Supp. 2d 836, 862 (N.D. Ill. 2009).

## III. Plaintiffs Do Not Plead Facts Giving Rise To A Strong Inference Of Scienter.

Plaintiffs' claims independently fail because Plaintiffs do not allege facts satisfying the heighted pleading requirement for scienter. Scienter, for a § 10(b) claim, means "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham*, 495 F.3d at 756. Recklessness, for these purposes, means conduct "so severe that it is the functional equivalent of intent." *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995). To plead scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). This "strong inference" must be both "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 309. In other words, a "strong inference" requires two things: "first the inference must be cogent, and second it must be as cogent as the opposing inference." *Makor Issues & Rights v. Tellabs*, 513 F.3d 702, 705 (7th Cir. 2008). Importantly, the scienter inquiry requires "look[ing] to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language

for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees." *Id.* at 708. "[T]he PSLRA does not permit scienter to be imputed among individual defendants." *Boeing*, 2022 WL 3595058 at *6.

### A.    Plaintiffs Do Not Allege Scienter For Any Individual Defendant.

As an initial matter, Plaintiffs do not allege facts supporting a strong inference that any of the Individual Defendants acted with scienter.  Plaintiffs do not allege any Individual Defendant knew facts that were inconsistent with any statement that Defendant made.  Plaintiffs offer a laundry list of allegations they contend support scienter.  (Compl. ¶¶ 390-446)  Their allegations are insufficient to support a strong inference of scienter, whether considered individually or collectively.

### 1.    The OSHA Complaint Does Not Support An Inference Of Scienter.

Plaintiffs first assert Defendants knew of the February 2021 OSHA complaint by the former Sturgis employee.  (Compl. ¶¶ 392-404; *supra* at 5)  But Plaintiffs fail to allege with particularity facts showing any Defendant knew about the complaint.  As discussed above, Plaintiffs' only attempts to plead such knowledge are (i) speculation from FE2 and (ii) correspondence between the lawyer for the OSHA complainant and Abbott's Legal department, not any Defendant.  *Supra* at 5-6, 8-9.

To begin, FE2's claims about each Defendant's supposed knowledge are not particularized; they are suppositions about what "would have" occurred, not what *did* occur.  *Id.*  As one court recently reasoned in rejecting similar speculation: "This is the language of supposition (albeit confident supposition), not personal knowledge, and does not suffice to establish that [the source] 'had any contact with the Individual Defendants or would have knowledge of what they knew.'"  *Sjunde AP-Fonden v. GE*, 2021 WL 311003, *8 (S.D.N.Y. Jan. 29, 2021).  The fact that a former employee "may have 'believed' that defendants were aware of certain data" is "'weak' at best," and does not satisfy the heightened pleading burden.  *Pension Trust v. DeVry*, 2017 WL 6039926, *13 (N.D. Ill. Dec. 6, 2017).

Plaintiffs' "would have" allegations are especially weak because they are from a "confidential"

source. The Seventh Circuit has repeatedly criticized securities plaintiffs' reliance on supposed confidential sources, explaining that withholding such witnesses' names only "obstruct[s] the judiciary's ability to implement the PSLRA." *Higginbotham*, 495 F.3d at 757. As a result, "[a]llegations concerning … unnamed confidential sources of damaging information require a heavy discount." *City of Livonia v. Boeing*, 711 F.3d 754, 759 (7th Cir. 2013); *Higginbotham*, 495 F.3d at 757 (discount should be "steep"). "The sources may be ill-informed, may be acting from spite rather than knowledge, may be misrepresented, [or] may even be nonexistent." *City of Livonia*, 711 F.3d at 759. Consequently, the Seventh Circuit has explained, it is "hard to see how information from anonymous sources could be deemed 'compelling.'" *Higginbotham*, 495 F.3d at 757. And the Court's skepticism came where the sources were asserting *facts*. Here, FE2 presents only supposition.

In any event, a plaintiff relying on a confidential source "must … describe the source with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Selbst v. McDonald's*, 432 F. Supp. 2d 777, 783, 787 (N.D. Ill. 2006) (plaintiffs "failed to allege facts detailing how [the witness] knew the contents of those financial reports, or how he knew that [defendants] ever saw them"). Plaintiffs fail to provide that information. They do not allege FE2's job *in media relations* had anything to do with OSHA complaints or that FE2 ever saw or was involved in Abbott's response to *any* OSHA complaint, much less the one in question. Additionally, FE2 left Abbott in November 2021, so he could not have had any role responding to media inquiries regarding the recall, which occurred months later. (Compl. ¶ 108) And Plaintiffs do not allege FE2 knew of problems at Sturgis before leaving Abbott, which supports an inference that Defendants also lacked such knowledge, given FE2's supposedly "senior" role within the Company.

Plaintiffs' allegations regarding the OSHA complainant's counsel's correspondence with Abbott's Legal department likewise do not support an inference about any Defendant's knowledge. First, Plaintiffs do not allege any Defendant received or was informed about the correspondence. *Supra* at

5-6.  Next, Plaintiffs do not allege the letter described the substance of the complainant's allegations about Sturgis such that someone who saw it would have known what the complainant was alleging. In fact, the letter (which the Court may consider as incorporated by reference) says *nothing* about infant formula or quality issues.  (Ex. 9)  And the Legal department's response further supports the point: It noted: "Abbott is not aware of any 'complaint[] filed with Michigan and federal authorities' nor any claims that Mr. [redacted] may have against it" and asked the counsel to "[p]lease advise me as soon as possible as to the substantive nature of the potential claims that Mr. [redacted] may have so that Abbott is able to identify and preserve the potentially relevant information."  (Ex. 10)  This exchange fails to show anyone at Abbott—much less any Defendant—knew about any problem at Sturgis.

### 2.      The Form 483s Do Not Support A Strong Inference Of Scienter.

Plaintiffs' other main contention is that the FDA Form 483s sent in 2019 and 2021 informed Defendants of serious problems at Sturgis.  (Compl. ¶¶ 405-10)  But alleging FDA inspectors sent these Forms to the Sturgis site director does not support a strong inference of scienter.

First, Plaintiffs do not allege facts showing any officer Defendant received the Form 483s. Only the non-officer Defendant, Lori Randall, is alleged to have been copied on Abbott's responses to them.  (Compl. ¶ 171)[11]  Plaintiffs assert Defendants *must* have received the 483s because an FDA manual instructs that "a copy of the Form 483 'should be sent to the top management of the firm.'" (*Id.* ¶ 169)  But that instruction is to FDA inspectors, not companies receiving Form 483s.  (Ex. 17 at 5-26 ("A copy should be sent to the top management of the firm including foreign management, unless the individual to whom *you* issued the original is the top official of the firm.") (emphasis added)) And, regardless of what the manual instructs, the Form 483s show who the FDA inspectors actually sent them to—and they did not send them to any Defendant.  *Supra* at 8.  In any event, Plaintiffs mischaracterize the manual, which does not use "top official" to mean corporate officers.  *Id.*

---

[11] Randall made only one (obviously immaterial) challenged statement, in a trade magazine interview.  (*Id.* ¶ 355)

Plaintiffs resort again to FE2, claiming FE2 purportedly "believed" or "estimated" that Defendants "*would have* been informed of the 483 Reports." (Compl. ¶ 408, emphasis added) This "would have" speculation fails for the same reasons discussed regarding the OSHA complaint. *Supra* at 30-31. Plaintiffs allege no facts showing FE2 had any involvement with either Form 483 or ever encountered *any* Form 483 while working at Abbott.

Second, the Form 483s would not support a strong inference of scienter even if Defendants had received them. As explained above, both Form 483s stated they "d[id] not represent a final Agency determination regarding ... compliance." (Ex. 14 at 1; Ex. 16 at 1) This is consistent with what Form 483s are generally—observations from individual FDA inspectors that are not final determinations of the FDA. *Supra* at 6-7; Compl. ¶ 208 (483s indicate "*potential* regulatory violations").

Courts have held that alleging the receipt of a Form 483 is not sufficient to plead scienter. For instance, in *In re Genzyme*, 2012 WL 1076124 (D. Mass. Mar. 30, 2012), a company stated that a new drug was on track for FDA approval and could be manufactured at a plant for other biologic drugs. *Id.* at *4. Subsequently, the FDA issued a Form 483 describing "at least *sixteen* deviations from CGMP." *Id.* at *3 (emphasis added). On an investor call afterwards, the company "made no mention" of the Form 483. *Id.* Months later, the FDA issued a warning letter regarding the same plant and "withheld approval of [the drug] until certain items were addressed." *Id.* at *4. Yet despite the Form 483's sixteen observations, the court held the plaintiffs had not pled facts supporting a strong inference of scienter. The court reasoned that the Form 483 "include[d] statements that tend against a conclusion of materiality," including that the observations "DO NOT REPRESENT A FINAL AGENCY DETERMINATION." *Id.* at *10. The court explained: "It simply cannot be that every critical comment by a regulatory agency—even about matters as important as good manufacturing practices—has to be seen as material for securities law reporting purposes, especially in an industry ... where there is constant and close supervision by the FDA." *Id.* Thus, the court held: "Given

33

the FDA's own warnings and enforcement policies surrounding its issuance, one can safely conclude that the immateriality [of] the Form 483 negates any inference of scienter." *Id.*

Additionally, Plaintiffs do not allege any Defendant knew Abbott had not or was not adequately addressing the Form 483s' observations. As the Seventh Circuit has explained, "[k]nowing of 'problems,' which are common, differs from knowing that a facility must be closed and some of its products recalled." *Plumbers & Pipefitters,* 679 F.3d at 955. To plead that the Form 483s support a strong inference of scienter for any Defendant who received them, Plaintiffs would have to plead with particularity that the Defendant knew Abbott's responses to the Form 483s—which were required to include corrective and preventative actions (Compl. ¶ 71)—were inadequate to address the cited issues. But Plaintiffs allege *nothing* about Abbott's responses to the Form 483s, much less specific facts showing any Defendant knew the information included in them was inaccurate or insufficient. Critically, though, Plaintiffs do not allege the FDA took any escalated action after receiving Abbott's responses, such as a warning letter or filing a lawsuit—either of which would have been public, so Plaintiffs would have had access to them. *Supra* at 6-8. Plaintiffs' failure to make such an allegation *vitiates* their proposed inference of scienter, for any Defendant who was aware of the Form 483 would most likely also have been aware of Abbott's response to it, identifying how Abbott planned to address the observed issues—and would have known that the FDA did not take further action.

Finally, receiving either Form 483 would not support a strong inference of scienter because neither Form asserts a systemic or serious problem likely to result in the recall and facility closure. The 2019 Form contained only a single observation related to product testing. *Supra* at 7. It did not assert Sturgis personnel were not conducting enough product tests or were not executing those tests correctly; rather, it quibbled with Sturgis's methodology for pulling samples to test, contending samples should be pulled from 60 cans rather than 60 samples from the top and bottom of 30 cans. (Ex. 14) Nothing about that assertion indicated a serious underlying issue or intent to deceive investors.

The September 2021 Form 483 contained more observations, but again, none that implied systemic problems. *Supra* at 7-8. If it did, Plaintiffs would have to explain why the FDA permitted Sturgis to remain open after the inspection or why it did not take any escalated action. And neither Form 483 even mentions Cronobacter, Salmonella, or any other bacterial contamination. Thus, the Form 483s do not support a strong inference that someone who read them would conclude Sturgis was at risk or a recall or temporary closure. *E.g.*, *Impax Labs.*, 2015 WL 5168777 at *5-6 (where Form 483 observations may have appeared "granular and technical," "the Court doubts that Form 483s, on their own, would constitute 'red flags'").

### 3. Plaintiffs' Attempt To Support Scienter Through Circumstantial Allegations Fails.

Lacking direct allegations about Defendants' knowledge of the supposed issues at Sturgis, Plaintiffs offer circumstantial allegations they say imply Defendants' state of mind. None does so.

*Site Visits:* Plaintiffs allege "[s]enior management had actual knowledge because they visited the [Sturgis] plant." (Compl. ¶¶ 411-12) But the only Defendant who Plaintiffs allege visited Sturgis is Lori Randall, who made only one challenged statement, which, as explained above, is non-actionable. (*Id.*; *supra* at 11) Additionally, Plaintiffs allege nothing about what visitors saw at Sturgis or whether issues like those identified in the Form 483s were perceptible to them. Plaintiffs admit the Sturgis facility is enormous: "the equivalent of more than 13 football fields—and sits on 94 acres." (Compl. ¶ 162) Alleging that someone "visited" Sturgis does not show they witnessed wrongdoing there. *E.g.*, *Rahman v. Kid Brands*, 736 F.3d 237, 245 (3d Cir. 2013) ("[T]he fact that a CEO visited a subsidiary's premises to meet with its president will not establish that the CEO had knowledge of illegal activities at the subsidiary."); *Sanders v. RealReal*, 2021 WL 1222625, *15 (N.D. Cal. Mar. 31, 2021) (similar).

*Information Access:* Plaintiffs allege "all senior management had access" "to all the information concerning the violations" via internal databases. (Compl. ¶ 413) But "[m]ere access to

sources of information—without any allegations regarding if, when, and how defendants actually accessed this information—is not enough to contribute to a strong inference of scienter." *Chandler*, 2022 WL 952441 at *27; *Plumbers & Pipefitters v. Allscripts*, 778 F. Supp. 2d 858, 884 (N.D. Ill. 2011) (same). Moreover, Plaintiffs' allegation relies exclusively on "FE5," a "Microbiology Supervisor" at an Abbott facility in Arizona. (Compl. ¶ 413) Plaintiffs offer no allegation how an employee at that level and location would know what databases the Company's CEO, CFO, and other officers had access to, let alone whether they actually accessed them. *Selbst*, 432 F. Supp. 2d at 782-83.

**Core Operations:** Plaintiffs claim "scienter is further evidenced by the critical nature of the sale of safe, uncontaminated infant formula within the U.S. to Abbott." (Compl. ¶ 422) But, at most, a "core operations" inference can support scienter only if "the operation in question constitute[s] nearly all of a company's business." *In re Fifth Third Bancorp Deriv. Litig.*, 2023 WL 2429009, *19 (N.D. Ill. Mar. 8, 2023); *Chandler*, 2022 WL 952441 at *25 (rejecting core operations assertion for failure to plead the operation was "core"); *In re Bally Sec. Litig.*, 2006 WL 3714708, *9 (N.D. Ill. July 12, 2006) (rejecting core operations inference entirely). Here, pediatric nutrition products comprised only about 5% of Abbott's sales—and (1) powdered infant formula was not Abbott's only pediatric nutrition product, and (2) Sturgis was not Abbott's only powdered infant formula plant. *Supra* at 2-3.

**Apologies And Leadership Changes:** Plaintiffs allege Defendant Ford apologized after the recall, stating, "[w]e're sorry to every family we've let down," and Defendant Calamari similarly said the Company was "deeply sorry." (Compl. ¶ 446) Plaintiffs claim these statements were "admission[s] of fault." (*Id.*) But an apology after the fact does not imply prior knowledge, much less fraudulent intent. The Sixth Circuit rejected a similar allegation, reasoning "[f]inding scienter based on such allegations would be equivalent to 'the classic fraud by hindsight case where a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly.'" *La. Sch. Ret. Sys. v. Ernst & Young*, 622 F.3d 471, 484 (6th Cir. 2010).

Similarly, that Abbott made "leadership changes" at Sturgis after the recall also does not support an inference of scienter.  (Compl. ¶ 431)  Such changes are "at most an acknowledgment that the company identified a better way of doing things moving forward, not an indicator that fraudulent intent existed." *In re Zagg Sec. Litig.*, 797 F.3d 1194, 1205 (10th Cir. 2015); *In re Baxter Sec. Litig.*, 2021 WL 100457, *17 (N.D. Ill. Jan. 12, 2021) (clawback of executive's bonus "does not contribute to a strong inference of scienter").  In addition, drawing inferences from after-the-fact improvements to operations is incompatible with Rule of Evidence 407.  *Higginbotham*, 495 F.3d at 760.

*Government Investigations:* Plaintiffs next allege that the DOJ's and SEC's investigations of Sturgis support a strong inference of scienter.  (Compl. ¶¶ 427-30)  But a government investigation after something has gone wrong does not support an inference that anyone knew there were potential problems beforehand (much less an inference that specific corporate officers knew and knowingly or recklessly made false public statements about it).  In *Fifth Third Bancorp*, Judge Ellis rejected just such a theory, reasoning that "Plaintiffs point to nothing in the [government action] that suggests that the Director Defendants had personal knowledge of any problematic practices at the time they made the challenged statements."  2023 WL 2429009 at *20.  Similarly, *Hill v. The Tribune Co.*, 2006 WL 2861016, *11 (N.D. Ill. Sept. 29, 2006), held that "the fact that government agencies were instituting investigations is no basis for strongly inferring scienter on the part of the individual defendants" where there were "no specific facts alleged about the government investigations" to support that inference.  Here, Plaintiffs similarly allege no facts about the government investigations supporting a strong inference that any Defendant was aware of any issues before the recall.

### B.        Plaintiffs Fail To Allege Scienter For Statements Made By Abbott.

Plaintiffs also fail to allege facts creating a strong inference of scienter for the statements made by Abbott.  As the Seventh Circuit has held, "[i]ntent to deceive is not a corporate attribute." *Makor Issues*, 513 F.3d at 707. "Someone low in the corporate hierarchy might make a mistake that formed

the premise of a statement made at the executive level by someone who was at worst careless in having failed to catch the mistake." *Id.* Thus, analyzing corporate scienter requires "look[ing] to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Id.* at 708; *City of Livonia*, 711 F.3d at 759 ("[U]nless the complaint created a strong inference that McNerney and Carson … knew [the statements] were false, there would be no fraud to impute either to them or to Boeing").

Yet here, many of the challenged statements appeared only on Abbott's website. Plaintiffs do not allege who prepared or approved them, much less that those individuals knew the statements were inaccurate. (*See* Appendix (noting statements with no identified maker)) Absent allegations about who prepared or approved an alleged misstatement *and* what that person knew, Plaintiffs have not met their burden to plead corporate scienter. In addition, Plaintiffs do not allege *when* the statements on Abbott's website were made. (*E.g.*, Compl. ¶¶ 317, 319) Consequently, Plaintiffs do not allege anyone who prepared or approved the statements knew *at the time* they prepared or approved that the statements were inaccurate.

### C. The Most Compelling Inference From Plaintiffs' Allegations Is That Defendants Did Not Act With Scienter.

For the reasons explained above, Plaintiffs' allegations do not support a strong inference of scienter. Moreover, the Supreme Court instructs that the scienter analysis is comparative—requiring courts to compare, from the totality of the facts alleged, the inference of scienter versus other competing inferences. *Tellabs*, 551 U.S. at 324. Doing so here strengthens the conclusion that Plaintiffs' allegations do not give rise to a strong inference of scienter.

The most plausible inference from the facts alleged is that Defendants were not aware that serious problems at Sturgis existed. Rather, to the extent they had any awareness of them at all, the

most likely scenario is they perceived them as the sorts of "hitch or glitch, [or] pratfall, in a company's operations," that need not "be disclosed in 'real time.'" *City of Livonia*, 711 F.3d at 759. Even when FDA inspectors sent the Form 483s, it is most likely that any Defendant who was aware of them also knew that Abbott had responded with a plan to address the observed issues—or, at the least, would have concluded Abbott had adequately responded given that the FDA did not send a warning letter or sue. Thus, Plaintiffs' allegations do not support an inference that high-level Abbott officials knew about any material problems at one of 90 manufacturing facilities. This inference is also supported by Plaintiffs' allegations that Sturgis personnel "falsifi[ed] … records" and *prevented* reporting of problems at the plant. (*E.g.*, Compl. ¶¶ 103, 116, 124-28 153, 439)

The inference of non-culpable intent is further strengthened by Plaintiffs' failure to plead Defendants had any reason to deceive investors about Sturgis. As the Seventh Circuit has explained when weighing competing inferences, a failure to allege a motive for fraud is significant, for "[w]ithout a motive to commit securities fraud, businessmen are unlikely to commit it." *City of Livonia*, 711 F.3d at 758. Plaintiffs do not allege any "unusual sales" by any Defendant of stock at a supposedly inflated price or any other personal benefit from the fraud. *E.g.*, *Higginbotham*, 495 F.3d at 759 ("One possible inference is that the *absence* of sales by other managers who would have been in the know … implies that nothing was thought to be out of the ordinary."); *Acito v. IMCERA*, 47 F.3d 47, 54 (2d Cir. 1995) (that "defendants did not sell their shares during the relevant class period undermines plaintiffs' claim"). Nor do Plaintiffs allege Sturgis was critical to Abbott's overall performance, such that Defendants could have been reluctant to disclose issues there earlier. *Plumbers & Pipefitters v. Zimmer*, 673 F. Supp. 2d 718, 748 (S.D. Ind. 2009) (noting that "the relative insignificance of the products involved in this case, which, when combined, accounted for a mere six percent of Zimmer's worldwide business during the period in question" undermined inference of scienter). To the contrary, the risks Abbott would undertake in knowingly shipping formula that could make infants ill would pale in comparison

to the minor hit the Company would take if it corrected the problems in advance. The illogic of Plaintiffs' scienter theory highlights its weakness: Plaintiffs' claim is premised on Defendants acting irrationally. As the Seventh Circuit has held, because "indulging ready inferences of irrationality would too easily allow the inference that ordinary business reverses are fraud. One who believes that another has behaved irrationally has to make a strong case." *DiLeo*, 901 F.2d at 629.[12]

Said differently, if Abbott's high-level officials actually became aware (via Form 483s or the OSHA complaint, for example) that Sturgis was at risk, they would have had every reason to head off further problems at the plant at the time they received those reports. That Plaintiffs instead allege they engaged in intentional "understaffing" and underinvestment thus only undermines any inference of scienter—such conduct suggests that Abbott's high-level officials did *not* realize that there were issues at the plant that needed correcting. (Compl. ¶ 437) Even if it were true that Abbott's officials took too "beady-eyed [a] view of proposals to invest" in the plant, that would (at worst) imply only mistaken business judgment, not knowing or reckless fraud. *Plumbers & Pipefitters*, 679 F.3d at 956. As the Seventh Circuit noted in *Plumbers*, "in a different year the headaches would have come from a different plant or a different product, but the fact that these problems occurred … does not imply that any manager was lying to investors." *Id.* at 956-57; *see also Pension Trust Fund*, 895 F.3d at 939 (even "careless mistakes at the management level" are "not enough" to survive dismissal). In short, the most plausible inference is that no Defendant acted with scienter.

## Conclusion

For the foregoing reasons, the Court should dismiss Plaintiffs' complaint.

---

[12] Other allegations further show that Plaintiffs implausibly premise their claims on irrational behavior. Plaintiffs allege Abbott's stock repurchase program "spen[t] billions on buybacks." (Compl. ¶ 439) But they also say Defendants schemed to artificially inflated the value of that stock. (*Id.* ¶¶ 466-67) Thus, under Plaintiffs' theory, Abbott knowingly spent enormous sums to buy overvalued stock. Not only is purchasing inflated stock implausible, *e.g.*, *Johnson v. Siemens*, 2011 WL 1304267, *14 (E.D.N.Y. Mar. 31, 2011), but such "[s]tock repurchase programs actually *negate* a finding of scienter." *Zimmer*, 673 F. Supp. 2d at 749 (emphasis in original).

Dated:  June 20, 2023

Respectfully submitted,

/s/ *Joshua Z. Rabinovitz*

Mark Filip
Joshua Z. Rabinovitz
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000
Mark.Filip@kirkland.com
Joshua.Rabinovitz@kirkland.com

James P. Gillespie (*pro hac vice*)
Joseph C. Schroeder
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington D.C. 20004
(202) 389-5000
jgillespie@kirkland.com
Joseph.Schroeder@kirkland.com

Brad Masters (*pro hac vice*)
KIRKLAND & ELLIS LLP
60 East South Temple
Salt Lake City, UT 84111
(801) 877-8100
Brad.Masters@kirkland.com

*Counsel for Defendants*