# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

PEMBROKE PINES FIREFIGHTERS & POLICE
OFFICERS PENSION FUND, Individually and on
Behalf of All Others Similarly Situated,

                      Plaintiff,

      v.

ABBOTT LABORATORIES, ROBERT B. FORD,
ROBERT E. FUNCK, JR., JOSEPH MANNING,
and CHRISTOPHER J. CALAMARI,

                  Defendants.

Case No. 1:22-cv-04661

District Judge Steven C. Seeger
**[Oral Argument Requested]**

## LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

SUMMARY OF THE FACTS ................................................................................... 4

I.     Abbott "Ensured" Compliance With Applicable FDA Regulations and "Promised" "Safety and Quality Throughout Every Stage of the Manufacturing Process" ................................................................................................................... 4

II.    Abbott Maintained Sturgis in "Egregiously Unsanitary" Condition .................... 5

    A.    Pre-Class Period FDA Inspection and Positive *Cronobacter* Tests ........................ 6

    B.    The Whistleblower Complaints .................................................................. 7

III.   The FDA Forces a Recall and Reports 20 Positive *Cronobacter* Tests, 128 Infant Infections, and Multiple Deaths, As the DOJ Secures Injunctive Relief .......................... 10

IV.   Abbott Denies Responsibility As Investors Lose Billions ................................ 11

LEGAL STANDARD ............................................................................................ 12

ARGUMENT ........................................................................................................ 13

I.     The Complaint Alleges Materially False and Misleading Statements and Omissions Throughout the Class Period .................................................................... 13

    A.    Defendants Misrepresented the Quality of Abbott Nutrition's Facilities, Testing Processes, and Safety of Its Powdered Infant Formula ............................ 14

         1.    Defendants' Misrepresentations Were False or Misleading ..................... 14

         2.    Defendants' Misrepresentations Were Material ....................................... 15

    B.    Defendants Misrepresented Compliance With CGMP and FDA Regulations .................................................................................................. 19

         1.    Defendants' Misrepresentations Were False or Misleading ..................... 19

         2.    Defendants' Misrepresentations Were Material ....................................... 20

    C.    Defendants Misrepresented the Contamination at Sturgis Post-Recall ................ 21

    D.    Defendants Misrepresented When Abbott Learned of the Whistleblower's Complaints and the Company's Practice of Non-Retaliation ............................... 23

    E.    Defendants' Remaining Challenges to Falsity Fail ............................... 24

    F.    The Complaint Sufficiently Pleads a Violation of Regulation S-K .................... 26

II.    The Complaint Adequately Alleges Scheme Liability .................................... 28

III.   The Complaint Adequately Alleges Defendants' Scienter ............................... 29

    A.    The February 2021 Whistleblower Complaint Supports Scienter ........................ 30

    B.    Form 483 Reports and EIRs Support a Strong Inference of Scienter .................. 33

    C.      Investigations, DOJ Complaint, and Consent Decree Support Scienter ...............35

    D.      The Importance of Infant Formula to Abbott's Business Supports Scienter .........36

    E.      Defendants' Site Visits to Sturgis Support a Strong Inference of Scienter ...........38

    F.      Defendants' Post-Recall Actions Also Support a Strong Inference of Scienter .................................................................................................................39

    G.     The Complaint Sufficiently Pleads Corporate Scienter As to Abbott ..................40

CONCLUSION.......................................................................................................................40

# TABLE OF AUTHORITIES

**C**ASES

*3226701 Canada, Inc. v. Qualcomm, Inc.*,
2017 WL 4759021 (S.D. Cal. Oct. 20, 2017) ................................................ 32

*Abramson v. NewLink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)......................................................................... 24

*Allegheny County Employees' Retirement System v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021) ........................................................... 37

*Allison v. Oak Street Health, Inc.*,
2023 WL 1928119 (N.D. Ill. Feb. 10, 2023) ........................................... 26, 36

*Anderson v. Aurora Township*,
1997 WL 802099 (N.D. Ill. Dec. 29, 1997) ................................................. 15

*Asher v. Baxter International Inc.*,
377 F.3d 727 (7th Cir. 2004) ....................................................................... 37

*Boston Retirement System v. Alexion Pharmaceuticals, Inc.*,
556 F. Supp. 3d 100 (D. Conn. 2021)............................................................ 25

*Brown v. Pfister*,
2020 WL 6393001 (N.D. Ill. Nov. 2, 2020) ................................................. 13

*Chalverus v. Pegasystems, Inc.*,
59 F. Supp. 2d 226 (D. Mass. 1999) ............................................................ 34

*City of Ft. Lauderdale Police & Firefighters' Retirement System v. Pegasystems Inc.*,
2023 WL 4706741 (D. Mass. July 24, 2023)................................................. 18

*City of Monroe Employees Retirement System v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ....................................................................... 16

*City of Sterling Heights General Employees' Retirement System v. Hospira, Inc.*,
2013 WL 566805 (N.D. Ill. Feb. 13, 2013) .................................................. 16

*City of Taylor Police & Fire Retirement System v. Zebra Technologies Corp.*,
8 F.4th 592 (7th Cir. 2021) ...................................................................... 3, 18

*Dahhan v. OvaScience, Inc.*,
2018 WL 3637969 (D. Mass. July 31, 2018)................................................. 38

*Desai v. General Growth Properties, Inc.*,
654 F. Supp. 2d 836 (N.D. Ill. 2009) ........................................................... 38

*Flynn v. Exelon Corp.*,
2021 WL 1561712 (N.D. Ill. Apr. 21, 2021) ................................. 13, 18, 27, 38

*Flynn v. Sientra, Inc.*,
2016 WL 3360676 (C.D. Cal. June 9, 2016) ................................................. 32

*Friedman v. Rayovac Corp.*,
   295 F. Supp. 2d 957 (W.D. Wis. 2003) .......................................................... 13

*Fryman v. Atlas Financial Holdings, Inc.*,
   2022 WL 1136577 (N.D. Ill. Apr. 18, 2022) ................................................ 35

*Galestan v. OneMain Holdings, Inc.*,
   348 F. Supp. 3d 282 (S.D.N.Y. 2018)........................................................... 17

*Garden City Employees' Retirement System v. Anixter International, Inc.*,
   2011 WL 1303387 (N.D. Ill. Mar. 31, 2011) ............................................... 40

*GE Healthcare v. Orbotech, Ltd.*,
   2009 WL 2382534 (E.D. Wis. July 2, 2009) ................................................ 13

*Government of Guam Retirement Fund v. Invacare Corp.*,
   2014 WL 4064256 (N.D. Ohio Aug. 18, 2014) ............................................ 21

*Hall v. Johnson & Johnson*,
   2019 WL 7207491 (D.N.J. Dec. 27, 2019) ................................................... 16

*Hedick v. Kraft Heinz Co.*,
   2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) .......................................... 32, 40

*Holwill v. AbbVie Inc.*,
   2020 WL 5235005 (N.D. Ill. Sept. 1, 2020) ........................................... 18, 28

*Huber v. Beth*,
   2023 WL 1437715 (E.D. Wis. Feb. 1, 2023) ................................................ 13

*In re Able Laboratories Securities Litigation*,
   2008 WL 1967509 (D.N.J. Mar. 24, 2008)........................................ 20, 29, 33

*In re Akorn, Inc. Securities Litigation*,
   240 F. Supp. 3d 802 (N.D. Ill. 2017) ........................................................... 36

*In re America Service Group, Inc.*,
   2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) ........................................... 40

*In re American Apparel, Inc. Shareholder Litigation*,
   2013 WL 174119 (C.D. Cal. Jan 16, 2013) .................................................. 31

*In re Apple Inc. Securities Litigation*,
   2023 WL 4195051 (N.D. Cal. June 26, 2023) ............................................... 22

*In re Atossa Genetics Inc. Securities Litigation*,
   868 F.3d 784 (9th Cir. 2017) ....................................................................... 25

*In re Baxter International Inc. Securities Litigation*,
   2021 WL 100457 (N.D. Ill. Jan. 12, 2021) .................................................. 40

*In re BHP Billiton Ltd. Securities Litigation*,
   276 F. Supp. 3d 65 (S.D.N.Y. 2017).............................................................. 17

*In re Boeing Co. Aircraft Securities Litigation*,
   2022 WL 3595058 (N.D. Ill. Aug. 23, 2022) ............................................... 19

*In re Cognizant Technology Solutions Corp. Securities Litigation*,
2020 WL 3026564 (D.N.J. June 5, 2020) ........................................................................ 28

*In re Countrywide Financial Corp. Securities Litigation*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) .......................................................................... 17

*In re Engineering Animation Securities Litigation*,
110 F. Supp. 2d 1183 (S.D. Iowa 2000) ................................................................... 27, 34

*In re Ford Motor Co. Securities Litigation*,
381 F.3d 563 (6th Cir. 2004) .......................................................................................... 16

*In re Galena Biopharma, Inc. Securities Litigation*,
117 F. Supp. 3d 1145 (D. Or. 2015) ............................................................................... 31

*In re Genzyme Corp.*,
2012 WL 1076124 (D. Mass. Mar. 30, 2012) ................................................................. 35

*In re Hollinger International, Inc. Securities Litigation*,
2006 WL 1806382 (N.D. Ill. June 28, 2006) .................................................................. 13

*In re LDK Solar Securities Litigation*,
584 F. Supp. 2d 1230 (N.D. Cal. 2008) .................................................................... 32, 33

*In re MF Global Holdings Ltd. Securities Litigation*,
982 F. Supp. 2d 277 (S.D.N.Y. 2013) ............................................................................ 17

*In re MicroStrategy, Inc. Securities Litigation*,
115 F. Supp. 2d 620 (E.D. Va. 2000) ............................................................................. 39

*In re Moody's Corp. Securities Litigation*,
599 F. Supp. 2d 493 (S.D.N.Y. 2009) ............................................................................ 17

*In re Motorola Securities Litigation*,
2004 WL 2032769 (N.D. Ill. Sept. 9, 2004) ................................................................... 40

*In re Mylan N.V. Securities Litigation*,
2023 WL 3539371 (W.D. Pa. May 18, 2023) ............................................................ 29, 33

*In re Neopharm, Inc. Securities Litigation*,
2003 WL 262369 (N.D. Ill. Feb. 7, 2003) ...................................................................... 13

*In re NeoPharm, Inc. Securities Litigation*,
705 F. Supp. 2d 946 (N.D. Ill. 2010) ........................................................................ 13, 16

*In re Pivotal Securities Litigation*,
2020 WL 4193384 (N.D. Cal. July 21, 2020) ................................................................. 26

*In re ProQuest Securities Litigation*,
527 F. Supp. 2d 728 (E.D. Mich. 2007) .......................................................................... 25

*In re Recalled Abbott Infant Formula Products Liability Litigation*,
2023 WL 3585639 (N.D. Ill. May 22, 2023) ...................................................... 12, 21, 23

*In re Signet Jewelers Ltd. Securities Litigation*,
2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ........................................................... 17, 18

*In re Sunbeam Securities Litigation*,
    89 F. Supp. 2d 1326 (S.D. Fla. 1999) ............................................. 39

*In re Top Tankers, Inc. Securities Litigation*,
    528 F. Supp. 2d 408 (S.D.N.Y. 2007) ............................................. 35

*In re Ulta Salon, Cosmetics & Fragrance, Inc. Securities Litigation*,
    604 F. Supp. 2d 1188 (N.D. Ill. 2009) ........................................... 31

*In re Yum! Brands, Inc. Securities Litigation*,
    73 F. Supp. 3d 846 (W.D. Ky. 2014) ............................................. 16

*Industriens Pensionsforsikring v. Becton, Dickenson & Co.*,
    620 F. Supp. 3d 167 (D.N.J. 2022) ............................................... 37

*Jones v. Corus Bankshares, Inc.*,
    701 F. Supp. 2d 1014 (N.D. Ill. 2010) ........................................... 36

*Karimi v. Deutsche Bank Aktiengesellschaft*,
    607 F. Supp. 3d 381 (S.D.N.Y. 2022) ............................................. 20

*Klein v. Altria Group, Inc.*,
    525 F. Supp. 3d 638 (E.D. Va. 2021) ............................................. 29

*Kuebler v. Vectren Corp.*,
    13 F.4th 631 (7th Cir. 2021) ..................................................... 7

*Last Atlantis Capital LLC v. AGS Specialist Partners*,
    749 F. Supp. 2d 828 (N.D. Ill. 2010) ........................................... 14

*Lewis v. Straka*,
    535 F. Supp. 2d 926 (E.D. Wis. 2008) ........................................... 30

*Lindelow v. Hill*,
    2001 WL 830956 (N.D. Ill. July 20, 2001) ....................................... 22

*Lorenzo v. Securities & Exchange Commission*,
    139 S. Ct. 1094 (2019) ........................................................... 28

*Louisiana School Employees' Retirement System v. Ernst & Young, LLP*,
    622 F.3d 471 (6th Cir. 2010) ..................................................... 40

*Macovski v. Groupon, Inc.*,
    553 F. Supp. 3d 460 (N.D. Ill. 2021) ........................................... 15

*Makor Issues & Rights, Ltd. v. Tellabs Inc.* (*Tellabs III*),
    513 F.3d 702 (7th Cir. 2008) ....................................... 30, 32, 37, 40

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    437 F.3d 588 (7th Cir. 2006) ..................................................... 13

*Marks v. CDW Computer Centers, Inc.*,
    122 F.3d 363 (7th Cir. 1997) ..................................................... 14

*McGuire v. Dendreon Corp.*,
    2008 WL 5130042 (W.D. Wash. Dec. 5, 2008) ...................................... 19

*Middlesex Retirement System v. Quest Software Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) ............................................ 25

*Mulligan v. Impax Laboratories, Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ........................................ 16, 31, 32, 33

*Norfolk County Retirement System v. Ustian*,
    2009 WL 2386156 (N.D. Ill. July 28, 2009) ................................... 29

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ......................................................... 38

*Nykredit Portefølje Administration A/S v. ProPetro Holding Corp.*,
    2021 WL 9037758 (W.D. Tex. Sept. 13, 2021) .............................. 18

*Odeh v. Immunomedics, Inc.*,
    2020 WL 4381924 (D.N.J. July 31, 2020) ................................. 19, 20

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015) ..................................................................... 25

*Ong v. Chipotle Mexican Grill, Inc.*,
    294 F. Supp. 3d 199 (S.D.N.Y. 2018) .......................................... 21

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000) ......................................................... 26

*Pension Trust Fund for Operating Engineers v. Kohl's Corp.*,
    895 F.3d 933 (7th Cir. 2018) ........................................................ 36

*Public Employees' Retirement System of Mississippi v. TreeHouse Foods, Inc.*,
    2018 WL 844420 (N.D. Ill. Feb. 12, 2018) ................................... 13

*Public Pension Fund Group v. KV Pharmaceutical Co.*,
    2013 WL 1831427 (E.D. Mo. Apr. 30, 2013) ................................ 33

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) ........................................................ 29

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ......................................................... 19

*Ross v. Career Education Corp.*,
    2012 WL 5363431 (N.D. Ill. Oct. 30, 2012) .............................. 32, 39

*Ruderman v. McHenry County*,
    2023 WL 130496 (N.D. Ill. Jan. 9, 2023) ..................................... 21

*Savory v. Cannon*,
    947 F.3d 409 (7th Cir. 2020) ......................................................... 3

*Securities & Exchange Commission v. Cook*,
    2015 WL 5022152 (S.D. Ind. Aug. 24, 2015) .............................. 22

*Shah v. Zimmer Biomet Holdings, Inc.*,
    348 F. Supp. 3d 821 (N.D. Ind. 2018) ...................................... 27, 33

*Simpson v. Nickel*,
  450 F.3d 303 (7th Cir. 2006) ...................................................... 3

*Sinnathurai v. Novavax, Inc.*,
  2022 WL 17585715 (D. Md. Dec. 12, 2022)............................. 31, 34

*Sparks v. City of Peoria*,
  2009 WL 3764032 (C.D. Ill. Nov. 10, 2009).................................. 24

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,
  552 U.S. 148 (2008)....................................................................... 29

*Stransky v. Cummins Engine Co.*,
  51 F.3d 1329 (7th Cir. 1995) ......................................................... 22

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015)............................................................. 26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).................................................................. 13, 29

*Theodore v. Purecycle Technologies, Inc.*,
  2023 WL 4035880 (M.D. Fla. June 15, 2023)................................ 37

*Thomas v. Magnachip Semiconductor Corp.*,
  167 F. Supp. 3d 1029 (N.D. Cal. 2016) ......................................... 39

*Todd v. STAAR Surgical Co.*,
  2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ........................... 20, 34

*Twin Master Fund, Ltd. v. Akorn, Inc.*,
  2020 WL 564222 (N.D. Ill. Feb. 5, 2020) ............................... 26, 31

*United States Securities & Exchange Commission v. Steffes*,
  805 F. Supp. 2d 601 (N.D. Ill. 2011) ............................................ 12

*United States Securities & Exchange Commission v. Winemaster*,
  529 F. Supp. 3d 880 (N.D. Ill. 2021) ............................................ 28

*United States v. Holm*,
  326 F.3d 872 (7th Cir. 2003) ......................................................... 15

*Washtenaw County Employees Retirement System v. Avid Technology, Inc.*,
  28 F. Supp. 3d 93 (D. Mass. 2014) ................................................ 36

## TREATISES, RESTATEMENTS & LAW REVIEWS

Michael J. Kaufman & John M. Wunderlich, *Messy Mental Markers: Inferring
  Scienter from Core Operations in Securities Fraud Litigation*,
  73 Ohio St. L.J. 507 (2012)............................................................ 37

## PRELIMINARY STATEMENT

If the Court accepts Defendants' characterization, investors filed this securities fraud lawsuit following a "regulatory compliance issue[]," that, at worst, amounted to a "hitch or glitch [or] pratfall." D.Br. 1, 39.[1] But that is not what occurred, or what the Complaint alleges. Far from it. Abbott's Sturgis, Michigan facility ("Sturgis")—which supplied powdered infant formula ("PIF") to nearly one in every five formula-fed infants in the United States—was a hotbed of microbiological contaminants that posed a risk of illness and death to babies. Sturgis was so "egregiously unsanitary" that numerous infant infections and deaths have been tied to PIF tainted with *Cronobacter* bacteria from that facility. Long after Defendants were warned about unsafe conditions at Sturgis, and only after the FDA stepped in, did Abbott shut down Sturgis for nearly six months and recall 70 million containers of PIF. The Department of Justice ("DOJ") then charged Abbott and its executives with violating multiple Food and Drug Administration ("FDA") regulations and concluded that Abbott has "been unwilling or unable to . . . ensure the safety and quality of food manufactured for infants, a consumer group particularly vulnerable to foodborne pathogens." Defendants thereafter entered into a Consent Decree and permanent injunction, submitting the Company to heightened monitoring. Abbott remains the target of several federal criminal and civil investigations.

Since the recall, investors learned that Defendants were made aware of Sturgis's condition years earlier. In late 2019, the FDA notified Abbott of unsanitary conditions at Sturgis, and the

---

[1] The term "Complaint" refers to Plaintiffs' Amended Class Action Complaint filed April 21, 2023 (ECF 35) (cited to herein as "¶__"). The terms "Plaintiffs," "Abbott," the "Company," "Defendants," and "Individual Defendants" are defined at ¶¶28-36, and other capitalized terms are defined in the Complaint Glossary of Key Terms, unless otherwise noted. "D.Br." refers to Defendants' Memorandum in Support of Motion to Dismiss (ECF 41); "D.Ex." refers to exhibits to the Declaration of Joshua Rabinovitz (ECF 42). "Ex.__" refers to exhibits to the Declaration of Lauren A. Ormsbee ("Ormsbee Decl."), filed concurrently herewith. All emphasis is added and internal citations omitted unless otherwise noted.

Company found *Cronobacter* in its PIF. On February 16, 2021, a Whistleblower ("WB") filed a complaint with the Occupational Safety & Health Administration ("OSHA") detailing multiple regulatory violations related to food quality and safety at Sturgis. Abbott received the complaint on February 19, 2021, and responded to OSHA on April 19, 2021. A former senior executive with the Company confirmed that the heads of Abbott's Nutrition group, including Defendants Calamari and Randall, would have been involved in responding to the complaint. This is not surprising since Defendant Randall had "overall responsibility" for "oversight of manufacturing locations and food safety, [and] product quality," as well as "oversight duties" for Sturgis. Months later, after Abbott took no corrective action, the WB filed a second, largely duplicative complaint with the FDA. This, together with reports of infant illnesses and deaths connected to Sturgis, led to the collapse of Abbott's scheme. Post-recall, Defendants continued to mislead investors, distancing themselves from the catastrophe at Sturgis, and claiming that Sturgis was not the source of the infections—a claim deemed "misleading" by FDA officials.

Investors had no reason to know any of this because Abbott had repeatedly promised that its facilities were clean and its PIF was safe. Investors could read the "Abbott Quality Promise" online, wherein Abbott's Nutrition division promised that its "facilities are . . . maintained to the highest Good Manufacturing Practice standards" and it "ensure[s] that our products comply with all global and local regulations." Abbott Nutrition also promised "extensive" product testing. Now, Abbott argues that its promises were neither false nor material, and that the Individual Defendants were unaware of the risks at Sturgis. These defenses are not credible.

*First*, Abbott claims that Plaintiffs have not pleaded falsity as to its post-recall statements (and broadly asserts that Defendants' pre-recall statements were not false by checking a box in its appendix). The Complaint identifies each statement and explains why it is false or misleading, and the evidence to that effect is overwhelming. For example, FDA officials confirmed that Sturgis

violated a host of regulations and was "***egregiously unsanitary***," that its inspection results were "***shocking***," and even that some of Abbott's statements were "***misleading***." The factual disputes raised by Defendants are not suitable on a motion to dismiss. *See Simpson v. Nickel*, 450 F.3d 303, 306 (7th Cir. 2006), *abrogated on other grounds*, 947 F.3d 409 (7th Cir. 2020).

*Second*, Abbott claims that its statements were immaterial "puffery." But the statements were not "aspirational." Abbott made statements of historical fact about critical issues: product safety, regulatory compliance, and the suitability of its facilities. Abbott characterized these statements as its "Promise." The Seventh Circuit has been clear: "securities law demands precision from retrospective disclosures." *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 596 (7th Cir. 2021). That is no less true here. Abbott bolstered its business with these statements, and cannot now claim, as a matter of law, that no reasonable investor cared.

*Third*, Plaintiffs' claims for "scheme liability" are equally sound based on Defendants having deceived FDA inspectors and covered up the pervasive quality control issues at Sturgis.

*Fourth*, the inference of scienter is strong and far more compelling than any counter-inference. The problems at Sturgis were widespread, and by February 2021, had resulted in: an FDA Form 483 and EIR, *Cronobacter* in PIF, a WB Complaint, and an open OSHA investigation. There is no serious dispute that the Company's General Counsel and Defendants Randall and Calamari knew of these issues. Yet Defendants ask the Court to believe that Abbott's CEO, Defendant Ford, remained unaware. This is not plausible. Indeed, FE2, a well-placed former employee who worked directly with Ford, explained that issues posing such drastic reputational damage to Abbott would have reached the "highest" levels of the Company. It is inconceivable that any of the Individual Defendants were unaware of the long-standing and pervasive quality control issues that plagued Sturgis. Considering the allegations holistically, the Complaint cogently pleads a strong inference of scienter. For these and all the other reasons stated herein,

Defendants' Motion should be denied.

## SUMMARY OF THE FACTS

**I.** **Abbott "Ensured" Compliance With Applicable FDA Regulations and "Promised" "Safety and Quality Throughout Every Stage of the Manufacturing Process"**

Abbott Nutrition accounts for 22% of Abbott's total sales, with U.S. sales of pediatric nutritional products, including PIF, totaling $2.19 billion in 2021, 40% of the entire U.S. market. ¶¶38, 41; D.Ex. 2 at 28. The Company "dominate[d]" the market for formula. D.Ex. 3 at 4. Abbott produced PIF in only three domestic locations, with Sturgis supplying nearly half of Abbott's formula, meaning that one in every five U.S. infants who relied on formula drank formula manufactured in Sturgis. ¶¶42-43. As FDA Commissioner Robert Califf ("Califf") explained, "Abbott's enormous market share left it with the responsibility for producing safe infant formula," a responsibility "that wasn't met." ¶¶7, 425.

Abbott promised clean facilities and safe PIF. ¶¶84-98; 308-58. Abbott also promised to "timely" identify and address any "product safety issues" that arose, ¶¶88, 351, and to foster an "environment where employees raise concerns in good faith without fear of retaliation," ¶95; *see also* ¶349. The "Corporate Newsroom" of Abbott's website included the Abbott "Quality Promise" that:

- Abbott Nutrition's "high-tech quality processes ensure safety and quality throughout every stage of the manufacturing process";

- Abbott Nutrition had "**CLEAN FACILITIES** . . . designed and maintained to the highest Good Manufacturing Practice standards" and that "[a]ll employees follow strict hygiene measures, such as . . . sanitized gloves"; and

- "**QUALITY CHECKS** . . . [Abbott] extensively test[s] each batch to ensure that it meets our quality standards, which are among the highest in the world."

- Abbott Nutrition "ensure[s] that [its] products comply with all global and local regulations."

¶¶86, 319, 322, 325. The Company also stated that it conducted "rigorous product-safety tests"

that verified "microbiology" and "packaging integrity" as well as "extensive finished product testing before releasing [items] . . . for commercial distribution," ¶¶93-94, 341, 343, and that its "facilities" were "deemed suitable," ¶332. Abbott publicly made similar statements throughout the Class Period. *See, e.g.*, ¶313 (promising "high-quality, safe, and effective products"); ¶329 (promising the "highest standards of quality, safety, and performance"); ¶341 ("ensur[ing] food safety through a tightly controlled manufacturing process").

The Individual Defendants emphasized those commitments. *See, e.g.*, ¶¶97, 441 (Ford stated Abbott was reinvesting profits into the business). Defendant Randall stated during a 2021 interview that Abbott "protect[s] [its] product through actions . . . and . . . behaviors" and that the Company was employing "best practices." ¶355. Abbott's Business Code of Conduct, signed by Defendant Ford and published on the "Investor" section of Abbott's website, asserted that the Company "adhere[s] to all laws, regulations and Abbott requirements that apply," that it "produce[s] and deliver[s] safe, effective products that people trust," and that a "commitment to the health and safety of the people who use our product is always at the forefront of everything we do." ¶351.

## II. Abbott Maintained Sturgis in "Egregiously Unsanitary" Condition

The foregoing statements were not true. In reality, Sturgis was rife with hazards that posed a direct threat to infants: standing water in production areas, deteriorating and cracked equipment, lax cleaning and hygiene practices, understaffed production and cleaning crews, and insufficient testing for microbiological agents, like *Cronobacter*, despite numerous known contamination events. *See, e.g.*, ¶¶1, 102-07, 110-15, 118-57. Typically harmless to adults, *Cronobacter* is deadly in infants, ¶¶59, 64-65, and contaminated formula posed serious financial and reputational risks to Abbott, *see, e.g.*, ¶¶76-79 (discussing "severe consequences" of violating regulations). By 2003, the FDA warned the entire PIF industry that *Cronobacter* was a serious concern, ¶¶63-65, and

mandated Infant Formula Current Good Manufacturing Practices ("CGMP") and other regulations that required Abbott to maintain facilities in "clean and sanitary condition," create controls to prevent the growth of microorganisms, and ensure that workers "practice good personal hygiene," ¶¶50-53; *accord* ¶54. Abbott failed to meet standards and terminated or otherwise penalized employees who raised such concerns. ¶¶15, 150-54, 270-72, 327-28, 349-50, 376, 440, 474.

### A. Pre-Class Period FDA Inspection and Positive *Cronobacter* Tests

The Individual Defendants learned of Sturgis's problems before the Class Period began. On September 24, 2019, the FDA inspected Sturgis and issued a Form 483 and Establishment Inspection Report ("EIR"), Abbott's first since 2010. ¶¶2, 82, 166-69. The FDA found that Abbott did not meet "the required microbiological quality standards." ¶¶2, 167, 333. Abbott had detected *Cronobacter* in a batch of PIF, and a baby who consumed Abbott's PIF tested positive for the deadly infection. ¶166. Moreover, far from conducting "rigorous" testing, *supra* 4, Abbott performed only **half** of the required microbiological tests per batch, ¶167; *see also* D.Ex. 14 at 1. The FDA also observed failing dryers, a key contaminant risk. ¶168. The next day, a finished PIF batch tested positive for *Cronobacter.* ¶213. Between fall 2019 and February 2022, Abbott's own testing detected *Cronobacter* on **at least eight separate** occasions. ¶172.

Because these were material events, the Individual Defendants were aware of the Form 483 findings. ¶¶407-10.[2] FDA guidelines call for delivering Forms 483 "to the top management of the firm." ¶70. Moreover, a former senior level Public Affairs and Media Relations executive (FE2) confirmed that *Cronobacter* posed a "reputational risk" to Abbott such that FDA findings, particularly those that involved *Cronobacter*, would have been reported to the Individual Defendants, and escalated to Defendant Ford in "less than a month." ¶409. This Form 483 was

---

[2] All of the information about the Forms 483 was on a Company-wide tracking system called "TrackWise" to which the Individual Defendants had access at all times. ¶413.

never disclosed to investors. ¶169.

**B.      The Whistleblower Complaints**

The situation only worsened throughout 2020. On February 16, 2021, the WB filed a complaint under the Food Safety Modernization Act ("FSMA") with OSHA, alleging "product safety issues," violations of CGMP, falsification of records, and release of untested infant formula. ¶¶99-104, 393.[3] The WB revealed that the Company concealed evidence of possible contamination from the FDA during its 2019 FDA audit. ¶¶112-13. On February 19, 2021, OSHA delivered the complaint to Abbott's General Counsel's office and began an investigation. ¶¶101, 270. Abbott was statutorily required to respond to the complaint and did so on April 19, 2021. ¶¶101, 270, 392. The only reasonable inference is that the Individual Defendants were aware of the WB Complaint nearly immediately. *See* ¶¶107-08; *see also* ¶¶392-95. Defendants completely ignore these allegations in their Motion to Dismiss.[4]

The WB also described employees repeatedly and intentionally falsifying testing information, ¶¶116-24, 393, and badly deteriorating dryers, ¶138. FE1, Abbott's former CGMP Food Safety Specialist, corroborated these allegations, explaining that dryers presented the biggest risk of contamination because there are no "kill" steps after drying before distribution. ¶¶131, 139.

---

[3] The redacted copy of the previously non-public February 2021 WB Complaint is attached as Ex. A to the Ormsbee Declaration, and the redacted publicly-released October 2021 WB Complaint is attached as Ex. B. *See, e.g.*, *Kuebler v. Vectren Corp.*, 13 F.4th 631, 636 (7th Cir. 2021) ("[A] plaintiff who is opposing a Rule 12(b)(6) . . . motion and who can 'show a court that there is likely to be some evidentiary weight behind the pleadings the court must evaluate' may find it beneficial to do so.").

[4] On August 1, 2023, Plaintiffs received redacted documents from OSHA pursuant to a FOIA request first filed in 2022. These documents confirm the Company's receipt of and response to the February 2021 WB Complaint, showing that Abbott's General Counsel's office received the complaint on February 19, 2021 (Ex. C), responded to OSHA on April 19, 2021 (Ex. D), and that the investigation was open and ongoing until August 2022, when the WB voluntarily withdrew his complaint "for reasons unrelated to the merits of the claims," including being subject to "false and derogatory statements and attacks" for filing the complaint and other unspecified "financial and other factors." The WB reiterated "the truthfulness, accuracy, and evidentiary support for his claims." Ex. E.

The dryers often tested positive for microorganisms and were a known "breeding ground" for *Cronobacter*. *Id.* FE1 noted that his supervisor, Susan Elgan, shared this information with Defendant Randall during weekly "Protect our Product" meetings. ¶139. FE1 and other employees requested funds from Abbott's headquarters in Illinois for improvements, including a new dryer. *Id.* Defendant Randall and other senior management visited Sturgis "often" to assess whether a new dryer would be "awarded." ¶¶139-42. FE1 explained that senior management dangled funding like a "carrot" in exchange for meeting production metrics. *Id.* Abbott corporate nonetheless did not remediate the problems at Sturgis, ¶¶15, 105, 172-73, or approve the funding requests, ¶¶139, 142, 441.

"Senior management" knew of the issues raised by the WB. ¶397. Prior to February 2021, the WB wrote to Abbott's General Counsel—who reports directly to Ford—notifying Abbott of the need to preserve records associated with the WB. ¶108. While Defendants quibble with the import of the letter (D.Br. 5-6), they unquestionably received the WB Complaint on February 19 and responded on April 19, 2021, ¶¶101, 270, 392; Exs. C, D. Filed pursuant to FSMA, a 2011 statute aimed at making top executives accountable for food safety violations, the WB Complaint, which raised systemic violations of formula CGMP and other laws, would have reached the attention of the Individual Defendants and, at the very least, Defendants Randall and Calamari, who, as senior executives in Quality and Pediatric Nutrition, would have helped craft the response on behalf of Abbott. ¶¶99-101, 107-08, 398, 400-01. FE2 confirmed that the WB Complaint "would have reached the highest levels of Abbott's management." ¶400. Defendants knew of these allegations and were, at a minimum, severely reckless in ignoring them. ¶¶402-03.

The WB further alleged that Sturgis's faulty "seamer" machine was causing powder to collect in the seams of the PIF containers, which led to bacterial growth. ¶¶118-20. Rather than replace the seamer, Abbott rigged the testing process to test only ***empty*** cans. ¶119. FE3, an

Operator at Sturgis, confirmed that he was trained to test empty cans to generate passing results. ¶123. FE1 confirmed these allegations and explained that the problems with the seamer "raised significant food safety concerns." ¶121. FE1 further recounted constant HVAC and roof leaks, which created a wet environment perfect for the growth of *Cronobacter*. ¶¶139, 143. FE1 recounted that the roof leaked so frequently that employees kept "special plastic tarp catchers" handy to collect water. ¶143. Defendants did not remediate these dangerous issues, ¶¶140-49, 214-15, and the DOJ later cited standing water as a violation in the DOJ Complaint, ¶147.

Significantly, the WB described a culture of retaliation where complainants were silenced. ¶¶151-53. In 2019, when the WB informed his supervisor that he was not comfortable hiding positive *Cronobacter* tests and releasing potentially contaminated product, he was told that a member of "senior management" was under pressure to meet its numbers. ¶¶110-14. In other words, Abbott's problem was a corrupt corporate culture that valued financial production metrics over consumer safety. ¶¶439-40, 442; *see also* ¶¶125-27, 134-37 (pointing to unrealistic metrics and cost cutting). Multiple Congressional Representatives drew the same inference during Defendant Calamari's May 2022 testimony. "[W]hen I read about falsification of records, swabbing empty cans, not really reporting on differing weights in cans, . . . it feels like there is just corruption from the top down in that plant." D.Ex. 23 at 78 (Rep. Schrier (D-WA)); *see also id.* at 124 (Rep. Bucshon (R-IN)); *id.* at 162 (Rep. Griffith (R-VA)); *id.* at 219 (Rep. Trahan (D-MA)). The DOJ and FDA later confirmed this. Indeed, the FDA "lost confidence that Abbott Nutrition had the appropriate safety and quality culture and commitments to fix these problems quickly." ¶¶17, 264.

In October 2021, the WB filed a second complaint, this time directly with the FDA, that repeated and expanded on the regulatory violations detailed in the February 2021 WB Complaint. *See* Ex. F (WB's February 2021 and October 2021 Complaints Comparison).

**III.    The FDA Forces a Recall and Reports 20 Positive *Cronobacter* Tests, 128 Infant Infections, and Multiple Deaths, As the DOJ Secures Injunctive Relief**

Abbott's problems escalated on September 20-24, 2021, when the FDA again inspected Sturgis. As in 2019, the FDA identified a host of problems in a Form 483 and EIR, which were sent to the "top management of the firm." ¶¶174-76, 408. The FDA found that Sturgis was not "clean" or "sanitary," and that employees working directly with infant formula did not wash their hands properly. ¶175. On the *same day* the FDA began the inspection, the agency learned that an infant who had consumed Sturgis formula was infected with *Cronobacter* and immediately reported this fact to Abbott. ¶177. There was another infant infection and death in December 2021, and additional reported infections in January and February 2022. ¶¶177-79. Defendant Randall received a copy of the September 2021 Form 483 and EIR, ¶176, and the other Individual Defendants were also made aware, *see supra* 6. Abbott nonetheless kept the Form 483 secret and failed to remediate the serious problems identified therein. ¶176.

Given the reported infections, poor inspection results, and WB Complaint, the FDA notified Abbott that it would inspect Sturgis again in January 2022. ¶179. According to FE3, after the first day of the inspection—once FDA inspectors left—Sturgis management spent the entire night "throwing everything out that wasn't nailed down" and "pouring bleach on the rest" to destroy relevant evidence before the FDA found it. ¶180. Nonetheless, FDA officials found *Cronobacter* the next day. ¶182. Over the next month, additional tests revealed a nightmare: positive *Cronobacter* results on *20 separate occasions*, even in high care areas. ¶182. Within days, Abbott was forced to shut down Sturgis, ¶¶12, 182, eliminating nearly half of its U.S. PIF supply, ¶42.

After unsuccessfully urging Abbott to announce a recall on February 15 and 16, the FDA issued a public warning against the consumption of PIF from Sturgis and announced an open

investigation into Abbott. ¶¶184-88. Only then did Abbott announce a limited recall that it characterized as "proactive" and "voluntary." ¶187. The Company also assured consumers and investors that the FDA only detected *Cronobacter* in non-product areas, despite the FDA detecting *Cronobacter* in both "medium" and "high" care areas, including scoop hoppers. ¶¶182, 190. Scoop hoppers feed formula scoops, which "are placed directly inside infant formula containers and contact product." D.Ex. 21 at 1; *see also* ¶¶182, 211, 361. The FDA and Abbott confirmed that *Cronobacter* was in the "production environment" and "finished powdered infant formula products." D.Ex. 21 at 5. The FDA confirmed that Abbott's dryers had "a history of internal deterioration dating back to September 2018." *Id.* at 5; *see also* ¶¶216, 415. Unsurprisingly, the dryers tested positive for *Cronobacter*. D.Ex. 21 at 8. On February 28, 2022, Abbott expanded the recall after another infant death. ¶¶202-04.

Between December 1, 2021 and March 3, 2022, the FDA received reports of nine infant deaths and 128 illnesses among infants who consumed Sturgis PIF; a report of a tenth death would come on June 10, 2022. ¶¶278-82. On March 22, 2022, the FDA released redacted versions of the Sturgis Forms 483. ¶¶206-07. On May 16, 2022, the DOJ filed an injunctive complaint alleging numerous violations and announced Abbott's agreement to enter into a Consent Decree (signed by Randall on Abbott's behalf) requiring Abbott to fix the unsanitary conditions at Sturgis. ¶¶248-52. On May 25, 2022, FDA Commissioner Califf testified before Congress, describing Sturgis as "***egregiously unsanitary***," "***unacceptably unsanitary***," and "***shocking***." ¶¶1, 261-62.

## IV. Abbott Denies Responsibility As Investors Lose Billions

Even amid these revelations, Defendants did not come clean. They claimed that Sturgis was not responsible for the infant infections. ¶241. Defendant Ford misleadingly stated that the *Cronobacter* was found only in non-product areas. ¶226. Defendant Calamari testified before Congress that Abbott did not know about the WB's Complaint until April 2022, ¶270, but that

- 11 -

claim was demonstrably false, ¶273. Calamari's claims came, in part, during questioning from Representative Kathleen Rice, who specifically asked when Abbott was "informed of the [WB] and their report." ¶270. Calamari feigned ignorance of the WB before April 2022. But Abbott had received the first complaint in February 2021, and responded to it in April 2021.

Abbott also unequivocally asserted that "[t]he formula from this plant did not cause these infant illnesses." ¶241; *see also* ¶¶237-38. But, on March 28, 2023, Frank Yiannas, former Deputy Commissioner of the FDA, testified that these statements were "misleading." ¶¶303-06. Yiannas explained that the available evidence "supported a conclusion that PIF made at Abbott's Sturgis plant was produced under insanitary conditions and a likely source of ongoing, sporadic contamination of PIF with multiple strains *C. sakazakii* over time." ¶306. Moreover, Judge Kennelly in this District has already found that plaintiffs in a group of consolidated personal injury actions "sufficiently alleged that a defect in Abbott's formula caused their injuries." *In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, 2023 WL 3585639, at *6 (N.D. Ill. May 22, 2023) (hereinafter "*Abbott MDL*"). Defendants nonetheless claimed that the *Cronobacter* infections were not "linked" to Sturgis. D.Br. 3-4.

All of this news was devastating, and between the February 17, 2022 and October 19, 2022 disclosures, investors lost $40 billion as Abbott's stock price declined 18.6%. ¶449. Abbott's dominant market share dropped dramatically from 48% to 28%. ¶282. On January 20, 2023, the DOJ announced a criminal investigation into this conduct, ¶295, and both the Federal Trade Commission and the Enforcement Division of the SEC have subpoenaed documents from the Company as part of investigations concerning Abbott's infant formula business, ¶¶299-300.

## LEGAL STANDARD

On a Rule 12(b)(6) motion, "the Court accepts as true all well-pleaded facts" and "all reasonable inferences that can be drawn therefrom." *U.S. Sec. & Exch. Comm'n v. Steffes*, 805

F. Supp. 2d 601, 607 (N.D. Ill. 2011). Even under the PSLRA, "[t]he purpose of a motion to dismiss . . . is to 'test the sufficiency of the complaint, not to decide the merits' of the case." *In re Hollinger Int'l, Inc. Sec. Litig.*, 2006 WL 1806382, at *10 (N.D. Ill. June 28, 2006). Importantly, "the PSLRA . . . requires no proof as opposed to plausible allegations." *Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, 2018 WL 844420, at *3 (N.D. Ill. Feb. 12, 2018).[5]

## ARGUMENT

### I. The Complaint Alleges Materially False and Misleading Statements and Omissions Throughout the Class Period

To plead a material misrepresentation under the PSLRA, a complaint need only allege facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006), *vacated and remanded on other grounds*, 551 U.S. 308 (2007). On the pleadings, "[t]he Court need not resolve whether the statements were actually false." *Flynn v. Exelon Corp.*, 2021 WL 1561712, at *7 (N.D. Ill. Apr. 21, 2021). Moreover, even "a statement that is technically true can still be misleading." *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 991 (W.D. Wis. 2003); *see also In re NeoPharm, Inc. Sec. Litig.*, 2003 WL 262369, at *11 (N.D. Ill. Feb. 7, 2003).

"[O]nly when the disclosures or omissions are so clearly unimportant that reasonable minds could not differ should the ultimate issue of materiality be decided as a matter of law." *In re NeoPharm, Inc. Sec. Litig.*, 705 F. Supp. 2d 946, 967 (N.D. Ill. 2010). Thus, "a materiality determination is rarely appropriate at the summary judgment stage, let alone on a motion to

---

[5] Defendants attach 25 exhibits, 15 of which were not referenced in the Complaint (*see* ECF 42), ignoring this Court's directive that "[w]hat matters on a motion to dismiss is the content of the complaint." *Brown v. Pfister*, 2020 WL 6393001, at *9 (N.D. Ill. Nov. 2, 2020) (Seeger, J.). Judicial notice at the pleadings stage should be used "sparingly" and "[o]nly in the clearest of cases." *GE Healthcare v. Orbotech, Ltd.*, 2009 WL 2382534, at *9 (E.D. Wis. July 2, 2009). Plaintiffs request that the Court "ignore any facts that may support the defendants' version of events if those facts are not alleged in the complaint." *Huber v. Beth*, 2023 WL 1437715, at *1 (E.D. Wis. Feb. 1, 2023).

dismiss." *Marks v. CDW Comput. Ctrs., Inc.*, 122 F.3d 363, 370 (7th Cir. 1997). The Complaint here identifies each misstatement or omission, the speaker, the date, and the facts that were misstated or omitted, and why each statement would be important to investors. Thus, it easily meets the relevant legal standards.

A. **Defendants Misrepresented the Quality of Abbott Nutrition's Facilities, Testing Processes, and Safety of Its Powdered Infant Formula**

1. **Defendants' Misrepresentations Were False or Misleading**

Throughout the Class Period, Defendants made statements such as: (i) Abbott Nutrition's "high-tech quality processes ensure safety and quality throughout every stage of the manufacturing process" (¶¶86, 319); (ii) "[b]efore releasing products for sale, [Abbott Nutrition] extensively test[s] each batch to ensure it meets our quality standards, which are among the highest in the world" (¶¶86, 325); (iii) Abbott's "nutrition business ensures food safety through a tightly controlled manufacturing process," and that Abbott "monitor[s] and verif[ies] microbiology, [and] packaging integrity" (¶¶94, 341); and (iv) Abbott Nutrition "conduct[s] rigorous product-safety tests," "monitor[s] and verif[ies] . . . nutrient and lot control," and "completes extensive finished product testing before releasing it for commercial distribution" (¶¶93-94, 341, 343, 345). These statements were on Abbott's website (to which investors were directed) in, among other places, its Nutrition "Quality Promise," its public filings including Forms 10-K and Global Sustainability Reports, Abbott's Code of Business Conduct, and they were distributed to the media. *See e.g.*, ¶¶313-19, 322-39, 362.[6]

These statements were false and misleading because Abbott fell woefully short of these

---

[6] False statements in Abbott's "Global Policy on the Marketing of Infant Formula," reprinted on Abbott's website during the Class Period, are actionable (D.Br. 11 n.6) because "it is reasonable for companies maintaining websites to anticipate that . . . investors might read and rely on website statements." *Last Atlantis Cap. LLC v. AGS Specialist Partners*, 749 F. Supp. 2d 828, 834 (N.D. Ill. 2010).

promises. The WB Complaints, the FDA Forms 483, EIRs, DOJ Complaint, Consent Decree, and the reports of former employees establish falsity. *See supra* 6-12; *see also generally* ¶¶99-272. Defendant Ford admitted that "the FDA's investigation did discover a bacteria in our plant that we will not tolerate," and as a result, Sturgis "fell short" of expectations, and Abbott would need to work to "earn[] back" the public's "trust." ¶260; *see also* ¶268 (Defendant Calamari testified "we know we let you down"). The DOJ Complaint laid out in stark detail the many regulatory violations at Sturgis and found that "injunctive relief [was] necessary" because Abbott's executives were "***unwilling or unable to implement sustainable corrective actions to ensure the safety and quality of food manufactured for infants***." ¶250.

Defendants do not seriously contest these statements' falsity. Instead, they simply mark an "X" on their separate Appendix challenging some (but not all) of these statements. *See* ECF 41-1 (marking ¶¶313, 322, 325, 327, 334, 336, 341, 345, 347, 349, 351 & 353 as "Not False/Misleading").[7] But "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003).

### 2. Defendants' Misrepresentations Were Material

Defendants devote a sizeable portion of their brief to materiality arguments. "The crux of materiality is whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company." *Macovski v. Groupon, Inc.*, 553 F. Supp. 3d 460, 476 (N.D. Ill. 2021). Defendants broadly challenge ***every*** statement concerning

---

[7] Defendants' Appendix is an improper attempt to exceed the already expanded page limitation. As such, the Court should disregard it and any "arguments" attempted therein. *See, e.g.*, *Anderson v. Aurora Twp.*, 1997 WL 802099, at *2 (N.D. Ill. Dec. 29, 1997) (striking addenda because defendants violated court's order on page limitation by including "legal argument in a condensed format" that was "styled as charts that offer defendants' substantive and evidentiary critique of plaintiffs' [allegations]").

the quality and safety of Abbott Nutrition's manufacturing facilities, testing processes, and nutritional products as immaterial "marketing rhetoric" (D.Br. 11) or "classic aspirational statements that investors do not rely on" (*id.* at 15).

Defendants do not explain how their statements that "promised" and "ensured" "safe" infant formula through "a tightly controlled manufacturing process" and "extensive finished product testing" were "so clearly unimportant that reasonable minds could not differ." *NeoPharm*, 705 F. Supp. 2d at 967. Indeed, they cannot. Sturgis produced 40% of the country's infant formula, such that one in every five American infants who are formula-fed relied on Sturgis's formula. *See supra* 4. Given consumers' outsized dependence on Sturgis-produced PIF, Abbott's ability to maintain a dominant position in the U.S. formula market was inextricably tied to the Company's strict adherence to quality and safety standards. ¶423.

Courts have found nearly identical statements to be sufficiently specific and material. *See, e.g.*, *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *16 (D.N.J. Dec. 27, 2019) ("quality and safety[] [is] our 'number-one priority'" found actionable (alteration in original)); *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 957, 968 (N.D. Cal. 2014) (statement that company "remains committed to providing the highest quality products" was material in "an industry where regulatory compliance, not to mention consistency and sanitation in production, is essential"); *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *18-19, *23 (N.D. Ill. Feb. 13, 2013) (same).[8] Moreover, Defendants' decision to emphasize these statements

---

[8] Defendants' cases (D.Br. 11-12, 14) are inapposite and present less definite statements. *See City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005) (description of tires "in terms of 'quality' . . . or benefitting from 'aggressive marketing' are too squishy, too untethered to anything measurable"); *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) (statement "Ford 'want[s] to make customers' lives . . . safer'" "not capable of objective verification" (alterations in original)); *In re Yum! Brands, Inc. Sec. Litig.*, 73 F. Supp. 3d 846, 864 (W.D. Ky. 2014) (quality statements "insignificant in the total mix of available information").

repeatedly, *e.g.*, ¶¶316, 319, 325, 351, is further evidence of materiality, *see, e.g.*, *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *11 (S.D.N.Y. Nov. 26, 2018) (statements "made repeatedly . . . may become material to investors"); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) (repeated discussions of dam safety underscored importance of topic).

Defendants' puffery defense also fails because the challenged statements were not "aspirational," but rather "misrepresentations of existing facts" that were materially false when made. *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 298 (S.D.N.Y. 2018); *accord In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 509 (S.D.N.Y. 2009) (statements not couched "in the language of optimism or hope" were not puffery). Defendants used concrete words and phrases to describe their quality control and food safety processes and concealed then-existing and known facts regarding the pervasive deficiencies existing at Sturgis. *See, e.g.*, *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 317 (S.D.N.Y. 2013) (finding misstatements describing controls as "robust," "effective," "adequate," and "comprehensive" actionable). Those statements were false and, given the dramatic contrast between the statements and the actual situation, Defendants' puffery argument falls flat. *See, e.g.*, *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1144 (C.D. Cal. 2008) ("Countrywide's practices so departed from its public statements that even 'high quality' became materially false or misleading; and that to apply the puffery rule to such allegations would deny that 'high quality' has any meaning.").

Defendants similarly challenge the Code of Business Conduct's "Product Quality" statements, ¶351, arguing they are *per se* inactionable "aspirational" descriptions of what employees "should" do. D.Br. 13-14. Tellingly, they do not refer to the actual words in the Product Quality section of Abbott's Code, which clearly describe Abbott's business and its purported commitment to "timely identifying, evaluating, and addressing product safety issues." ¶351. Such "unqualified statements regarding the Company's conduct . . . take the Code of Conduct and

Corporate Guidelines out of the realm of nonactionable aspirational statements." *Flynn*, 2021 WL 1561712, at *9; *City of Ft. Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems Inc.*, 2023 WL 4706741, at *9 (D. Mass. July 24, 2023) (code of conduct statement "not 'aspirational'" when "it describes with specificity a course of conduct that [company] promised to abjure"); *Nykredit Portefølje Admin. A/S v. ProPetro Holding Corp.*, 2021 WL 9037758, at *17 (W.D. Tex. Sept. 13, 2021) ("Because [the] Code of Ethics specifies practices . . . that purport to reflect the current state of the company, . . . these statements are actionable."); *In re Signet Jewelers*, 2018 WL 6167889, at *17 ("[S]tatements contained in a code of conduct are actionable where they are directly at odds with the conduct alleged in a complaint."); *Holwill v. AbbVie Inc.*, 2020 WL 5235005, at *4 (N.D. Ill. Sept. 1, 2020) (same).

Defendants' heavy reliance on *City of Taylor* (D.Br. 1, 10, 16, 17-19, 22-23) is misplaced as that decision actually **supports** Plaintiffs' claims. There, a CEO stated that an ongoing post-merger business consolidation was "progressing as planned." The court concluded that this statement "cannot be called false" because the "consolidation continued throughout the class period" and successfully concluded. 8 F.4th at 595. The court also reasoned that the "statement did not make any concrete assertion," but "expressed only vague optimism." *Id*. Unlike in *City of Taylor*, the challenged statements here **do** make "concrete assertion[s]" as to Abbott Nutrition's adherence to safety and quality standards (¶¶86-94, 322-25, 351-52); there is no expression of "vague optimism" that it **may** adhere to those standards.

Finally, defying the plain meaning of clear words, Defendants argue that no "reasonable investors would . . . understand Abbott's 'Quality Promise' as guaranteeing compliance" with its promises. D.Br. 15-16 (citing *City of Taylor* in support). But making a promise to adhere to standards and comply with regulations is making a guarantee—that you will make every effort to fulfill your promise. Defendants did not do this. Indeed, the DOJ found that they were "***unwilling***

*or unable* to implement sustainable corrective actions to ensure the safety and quality of food manufactured for infants." ¶250.

Defendants' reference to a single risk disclosure that "no assurance can be given" that Abbott would remain in compliance with all FDA regulations (D.Br. 16, citing ¶334) does not save them because Abbott was actively violating FDA regulations when they made their statements, as confirmed by the FDA in 2019 and the WB. ¶¶109-54, 165-68. *See also Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose *that the risk has transpired*."). Defendants point to a 2017 warning letter issued to Abbott concerning a cardiac defibrillator as providing investors with ample warning that their assurances of safety and quality could not be material. D.Br. 12, 16 (citing *In re Boeing Co. Aircraft Sec. Litig.*, 2022 WL 3595058 (N.D. Ill. Aug. 23, 2022)). However, in *Boeing*, the court only dismissed "general statements about the [Boeing] aircraft's safety, Boeing's core values, and Boeing's commitment to safety" because "two closely related plane crashes, followed by an indefinite emergency grounding order from the FAA" had recently occurred and were all "*public knowledge*." 2022 WL 3595058, at *18-19. Not only did Abbott Nutrition's statements about safety and quality here have no connection to cardiac devices, but the public was completely unaware of the PIF contamination issues at Sturgis.[9]

## B. Defendants Misrepresented Compliance With CGMP and FDA Regulations

### 1. Defendants' Misrepresentations Were False or Misleading

As a PIF manufacturer, Abbott is subject to a variety of regulations that require mandatory

---

[9] The receipt of a Form 483 is "material" since it identifies "'significant objectionable conditions' [that] would significantly alter the total mix of information available to the reasonable investor." *McGuire v. Dendreon Corp.*, 2008 WL 5130042, at *6 n.4 (W.D. Wash. Dec. 5, 2008); *see also Odeh v. Immunomedics, Inc.*, 2020 WL 4381924, at *7 (D.N.J. July 31, 2020) ("[A] reasonable shareholder could consider the omitted information about . . . the Form 483 to be important when making an investment decision.").

compliance. *See generally* ¶¶47-58, 444. As FDA Commissioner Califf stated, Abbott failed to meet its "responsibility for producing safe infant formula," and the FDA, as a result, "lost confidence that Abbott Nutrition had the appropriate safety and quality culture and commitment to fix these problems quickly." ¶¶7, 17. Yet, Defendants repeatedly stated during the Class Period that Abbott complied with the FDA's Infant Formula CGMP and various other rules or regulations. *See, e.g.*, ¶¶86-87, 89, 91, 93-94, 313, 325, 327, 343, 347, 349, 351, 353. These statements cannot be reconciled with Abbott's repeated and pervasive CGMP deficiencies and violations of FDA regulations, and the related consequences. *See supra* 7-8. Abbott "may not lead its investors to believe that it is in compliance with FDA regulations while knowing that an FDA inspector concluded otherwise." *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *6 (C.D. Cal. Apr. 12, 2016). This is particularly true when, as here, management sought to deceive FDA auditors during their onsite inspections. *See, e.g.*, ¶¶3, 111-37, 162-64, 180, 307, 445; *Odeh*, 2020 WL 4381924, at *3. As noted *supra* 15, aside from placing an "X" in a chart, Defendants do not specifically address these statements, thus waiving any challenge to falsity.

### 2. Defendants' Misrepresentations Were Material

Defendants assert that "statements that a company complies with food-safety laws" are *per se* immaterial puffery and that "[c]ourts routinely reject broad statements about regulatory compliance in §10(b) cases." D.Br. 12-13. This is not the case, especially when the statements are not merely aspirational but, as here, clear, direct, and phrased as a promise or commitment. *See, e.g.*, *In re Able Lab'ys Sec. Litig.*, 2008 WL 1967509, at *3, *16 (D.N.J. Mar. 24, 2008) (sustaining statements that company was "committed to [the FDA's current [CGMP]] compliance," because "[t]he Form 483 . . . provided notice to the defendants that serious problems existed in the manufacturing process"); *Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 393 (S.D.N.Y. 2022) (statements describing regulatory compliance actionable when company's

processes "routinely 'fail[ed] to prevent substantial violations'"); *Gov't of Guam Ret. Fund v. Invacare Corp.*, 2014 WL 4064256, at \*3-6 (N.D. Ohio Aug. 18, 2014) (compliance assurances actionable when there were "numerous, pervasive and repeated violations of FDA and FDCA regulations," all of which were identified in Forms 483). The statements at issue here cannot be reconciled with the reality of Defendants' non-compliance as identified by the FDA and the WB.[10]

### C. Defendants Misrepresented the Contamination at Sturgis Post-Recall

The Complaint alleges that once the FDA and investing public uncovered the "egregiously unsanitary" conditions at Sturgis, Defendants made a series of materially misleading statements concerning the cause of the recall, the extent of contamination, and the links between the infant illnesses and Sturgis. ¶¶359-73. In response (D.Br. 17-20), Defendants raise only highly "[f]actual issues [that] are not to be determined on a motion to dismiss." *Ruderman v. McHenry Cnty.*, 2023 WL 130496, at \*5 (N.D. Ill. Jan. 9, 2023). These arguments fail.

Defendants first contend that their statements describing the Sturgis recall as a "proactive, voluntary recall" cannot serve as the basis of a Section 10(b) claim. D.Br. 18. But these statements were misleading because Abbott failed to disclose that the FDA had ***demanded the recall*** three times, days earlier, and Abbott acquiesced only after the FDA issued a consumer advisory. *See* ¶¶9-10, 187-89. In other words, the recall was not "proactive." *See Abbott MDL*, 2023 WL 3585639, at \*2 ("FDA recommended that Abbott voluntarily recall its infant formula three times before Abbott finally did so on February 17, 2022."). That the FDA also announced that it had an "ongoing investigation" at Sturgis the same day as Abbott's recall announcement (D.Br. 18) has

---

[10] Defendants' cited cases are inapposite. For example, in *Ong v. Chipotle Mexican Grill, Inc.*, defendants' statements—for example, that Chipotle had programs that were ***"designed" to comply*** with regulations—were couched in aspirational terms that "did not amount to a guarantee." 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018). Here, Abbott stated unequivocally that "***we ensure that our products comply*** with all global and local regulations." *See, e.g.*, ¶¶316, 325.

no bearing on Defendants' obligations to tell the entire truth. *See Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995) ("If one speaks, he must speak the whole truth."); *In re Apple Inc. Sec. Litig.*, 2023 WL 4195051, at *5 (N.D. Cal. June 26, 2023) ("Defendants provide no authority indicating that disclosure in one context . . . ameliorates misrepresentation in another.").

Defendants also insist that their repeated statement that *Cronobacter* was found only "in non-product contact areas" was true because the Form 483 issued after the product recall characterized the area in question as "Zone 2." D.Br. 19; D.Ex. 21. Yet, "the disclosure required by the securities laws is measured ***not*** by literal truth, but by the ability of the material ***to accurately inform rather than mislead prospective buyers***." *Lindelow v. Hill*, 2001 WL 830956, at *3 (N.D. Ill. July 20, 2001). Defendants fail this test because they suggested that Sturgis posed no real danger of contaminating the product. ¶360. That was false.

The Form 483 in question states that "*Cronobacter*" was detected on a "scoop hopper" that was "utilized to feed scoops, ***which are placed directly inside infant formula containers that contact product***." ¶361 (citing Form 483). Abbott considers this a "***high care area***." ¶211 (citing Form 483). Additionally, the incident in question was not an isolated one. The Complaint avers that agency testing and Abbott's own internal records confirmed the presence of *Cronobacter* in medium and ***high care areas*** of PIF production through sampling "***on eight occasions between 10/10/19 - 2/2/22***." ¶212. Thus, the contamination posed a very real danger, and the statement is misleading. *See Sec. & Exch. Comm'n v. Cook*, 2015 WL 5022152, at *17 (S.D. Ind. Aug. 24, 2015) ("The law is well-settled that statements that create a false impression about a company are false, [and] misleading.").

Defendants' argument concerning the meaning of "Zone 2" changes nothing. D.Br. 19. Defendants cite a 2017 FDA draft guidance document that provides a non-binding "example" of how a ready-to-eat food plant might divide itself into "four zones." D.Ex. 22 at 34-35. PIF is not,

however, a ready to eat food, and demands higher standards of care because of the lack of sterilization and need for further processing by the consumer. ¶¶60-65. Moreover, even in these sample zone definitions, Zone 1, Food Contact Surfaces, explicitly **includes** "hoppers," defeating Defendants' arguments. D.Ex. 22 at 34.

Finally, Defendants claim that "no distributed product has tested positive" for *Cronobacter* and that the "genetic makeup" of the *Cronobacter* at Sturgis did not match that of the reported infections. D.Br. 19-20; *see also* ¶¶360, 371-72. Abbott even asserted unequivocally that "[t]he formula from this plant did not cause these infant illnesses." ¶¶237-38, 241. But the evidence establishes otherwise, and the FDA has described these statements as "misleading" on multiple occasions. On March 28, 2023, following an extensive investigation, former FDA Deputy Commissioner Yiannas testified that such statements were "misleading" because "the weight of the evidence" "supported a conclusion that [PIF] made at Abbott's Sturgis plant was produced under insanitary conditions and [was] *a likely source of ongoing, sporadic contamination of [PIF] with multiple strains [of Cronobacter] over time*." ¶¶22, 304-06, 361; *see also* ¶¶248-52 (quoting similar conclusion reached by the DOJ). Dr. Susan Mayne, Director of FDA Center for Food Safety and Applied Nutrition, also identified the flaws in Defendants' statements. ¶244. Defendants do not even mention this damning testimony, much less provide a cogent explanation as to why it is wrong. *See also Abbott MDL*, 2023 WL 3585639, at *5 (finding "a plausible inference that the formula produced by Abbott was contaminated and made the plaintiffs' infants ill, whether with *Salmonella* or other illnesses, diagnosed or not").

### D. Defendants Misrepresented When Abbott Learned of the Whistleblower's Complaints and the Company's Practice of Non-Retaliation

On April 28, 2022, news reports of the "extremely disturbing" and "damning" October 2021 WB Complaint became public. ¶¶229-33. When Defendant Calamari testified before

Congress in May 2022, he was well-prepared for questions, and knew something that no one in Congress, the media, or the investing public knew: the WB had filed a substantively identical complaint in February 2021, and Abbott formally responded in April 2021. ¶¶99-101. Calamari nonetheless lied. He stated under oath that Abbott "became aware of the [WB] complaint in the end of April [2022]." When Representative Rice asked if it was correct to say that the WB "went directly to another source [the FDA], [t]hey did not go to you," Calamari responded affirmatively, notwithstanding that the WB **had** raised concerns with Abbott in 2019, 2020, and February 2021. ¶¶270, 374; D.Ex. 23 at 184. Calamari even blamed the WB for not bringing his complaints to Abbott itself. *Id.* at 185-86; ¶¶270, 375. He also misrepresented Abbott's retaliatory practices, stating, "we have a zero tolerance policy for retaliation against these types of complaints." ¶374; *see also* ¶¶327, 349 (similar statements). Defendants do not directly challenge these statements.

Focusing solely on Calamari's Congressional testimony about the WB, Defendants argue that his testimony was technically truthful because he referred only to the WB's October 2021 FDA Complaint—not the original February 2021 Complaint. This interpretation is not credible. Even if it were, it would still mean that Calamari misled members of Congress into believing he knew nothing about the WB Complaint until Spring of 2022, when that was not true. Notably, Defendants do not claim that Calamari was unaware of the WB's February 2021 Complaint— because he was. ¶¶107-08, 398, 400-01. Regardless, "[f]actual *sufficiency* is tested later by either a motion for summary judgment under Rule 56, or by a trial," not on a motion to dismiss. *Sparks v. City of Peoria*, 2009 WL 3764032, at *1 (C.D. Ill. Nov. 10, 2009).

### E.     Defendants' Remaining Challenges to Falsity Fail

Defendants also assert that a handful of statements are mere opinions. D.Br. 22-23. As an initial matter, Defendants' repeated pronouncements regarding "suitability" are statements of fact, not opinion. ¶¶332-37, 362-67. They do not equivocate and are not prefaced with words that might

normally imply an opinion, such as "I think." *See Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 176 (2d Cir. 2020) (representation is "framed like a statement of opinion" when "couch[ed] . . . with prefatory language like 'I believe' or 'In my estimation'"). Regardless, opinion statements are not *per se* unactionable; they are actionable when, as here, the speaker omits "facts going to the basis for the . . . opinion." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015). And Defendants' omissions regarding the pervasive quality control issues at Sturgis render all the so-called opinion statements actionable. *See In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 802 (9th Cir. 2017) (noting "opinion statement did not 'fairly align[] with the information in [defendant's] possession'") (first alteration in original).

Defendants also claim that Ford and Funck cannot be liable for their signatures on Abbott's Sarbanes-Oxley ("SOX") disclosures. ¶¶336, 338, 366, 368. But "SOX certifications that the securities filings do not contain any untrue statement of a material fact or any material omission are actionable when a court concludes that a filing did, in fact, contain material[ly] false or misleading statements." *Boston Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 129 (D. Conn. 2021). Here, Plaintiffs adequately allege the SOX certifications were materially false or misleading because Defendants represented that Company facilities were "deemed suitable," when Defendants were aware that the Sturgis facility was not. *See* ¶¶336-38, 366-68.

Defendants posit that because Defendants Ford and Funck "certified only 'based on [their] knowledge," they should escape liability. *See* D.Br. 21. As discussed above, Ford and Funck had knowledge of the conditions at Sturgis, but even if they did not, executives cannot escape responsibility by not investigating facts in connection with their companies' filings. *See, e.g.*, *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1189 (C.D. Cal. 2007) ("For these certifications to have any substance, signatories to the certifications must be held accountable for the statements."). Indeed, SOX certifications are "expressly intended to prevent top executives

from using a 'head in the sand' defense." *In re ProQuest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007).

### F. The Complaint Sufficiently Pleads a Violation of Regulation S-K

Defendants also failed to disclose Abbott's systemic quality control deficiencies in the production and manufacturing of its PIF as (i) an uncertainty or trend reasonably likely to result in lawsuits and regulatory actions (and have a negative impact on the Company's financials or operations), as required by Item 303 of Regulation S-K; or (ii) a significant factor making investment in Abbott speculative and risky, as required by Item 105.[11] Further, Defendants also had ineffective disclosure controls in violation of Item 307. *See* ¶¶377-89.

In *Stratte-McClure v. Morgan Stanley*, the Second Circuit held that "Item 303's affirmative duty to disclose in Form 10-Qs ***can serve as the basis for a securities claim under Section 10(b)***," so long as that "violation of Item 303's disclosure requirements . . . satisfies *Basic*'s test for materiality." 776 F.3d 94, 101-03 (2d Cir. 2015); *see also id.* at 103-04 ("At a minimum, *Oran* [*v. Stafford*, 226 F.3d 275 (3d Cir. 2000)] is consistent with our decision that failure to comply with Item 303 in a Form 10-Q can give rise to liability under Rule 10b-5 so long as the omission is material under *Basic*, and other elements of Rule 10b-5 have been established."). In recent cases, courts in this District have found *Stratte-McClure* "persuasive," holding that violations of Items 303 and 105 *can* provide a basis for §10(b) liability. *See, e.g.*, *Twin Master Fund, Ltd. v. Akorn, Inc.*, 2020 WL 564222, at *6-7 (N.D. Ill. Feb. 5, 2020); *Allison v. Oak St. Health, Inc.*, 2023 WL 1928119, at *8 (N.D. Ill. Feb. 10, 2023).

As discussed herein, Plaintiffs have adequately alleged that Defendants failed to disclose that the Sturgis facility was rife with serious (and repeat) CGMP violations, and that those

---

[11] The Complaint inadvertently references Item 503 in ¶382; it should reference Item 105. *See In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *8 (N.D. Cal. July 21, 2020) (Item 503 is the same as Item 105).

violations were "reasonably likely" to negatively impact the Company and its financials, all in violation of Item 303. *See* ¶¶377-89. Accordingly, contrary to Defendants' assertion that "Plaintiffs' allegation is a characterization, not a fact," D.Br. 24, the Complaint identifies "systemic" compliance failures at Sturgis which posed a risk of material negative impact. *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 839-40 (N.D. Ind. 2018).

With respect to Item 105, Defendants referred to regulatory action as only a potential risk in boilerplate terms. ¶¶334, 364, 383. They failed to disclose that these risks had already materialized by the time of those disclosures due to Abbott's CGMP violations. For example, when Abbott issued its 2020 Form 10-K, Defendants already were aware that the Sturgis facility suffered from extensive manufacturing and quality control deficiencies and had received a Form 483 in September 2019 identifying, *inter alia*, flaws in Abbott's formula testing. ¶¶162-73, 334-35; *see also Flynn*, 2021 WL 1561712, at *8 (compiling decisions that hold "Items 105 and 303 . . . impose a duty to disclose any regulatory noncompliance in its SEC forms").

Defendants claim that "[q]uality-control issues at pharmaceutical . . . producers are endemic." D.Br. 26. However, "that many companies were doing the same thing . . . does not excuse a fraudulent practice." *In re Eng'g Animation Sec. Litig.*, 110 F. Supp. 2d 1183, 1195 (S.D. Iowa 2000). Defendants also assert that "each Form 10-K cautioned that 'risks Abbott currently considers immaterial could also affect Abbott's actual results.'" D.Br. 26. But Defendants knew the risks were not "immaterial." *See Shah*, 348 F. Supp. 3d 842 ("[G]eneric categorical statements of risk cannot inoculate otherwise misleading statements, especially when [defendant] was alleged to have known the specific facts relating to the quality system issues at its major . . . plant which would inevitably be a regulatory disaster.").

Finally, because Abbott's SEC filings contained known false and misleading statements and omissions, Defendants Ford and Funck could not have truthfully certified that Abbott's

disclosure controls were effective. *See, e.g.*, ¶¶387-88. Nothing more is required to plead an Item 307 violation. *See AbbVie*, 2020 WL 5235005, at *4 ("The Court agrees with Plaintiff that [the officers] could not have truthfully certified that AbbVie's disclosure controls were effective given the above allegedly material misleading statements contained in AbbVie's SEC filings.").

## II.    The Complaint Adequately Alleges Scheme Liability

Abbott and the Individual Defendants are also liable under SEC Rules 10b-5(a) and (c) for engaging in deceptive conduct – i.e., they are subject to "scheme" liability. The Supreme Court recognizes that the scope of Rules 10b-5(a) and (c) is "expansive" and its "provisions capture a wide range of conduct" that can (but does not need to) include false and misleading misrepresentations. *Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094, 1101-02 (2019). A complaint "state[s] a valid claim for 'scheme liability'" if it adequately alleges: "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *16 (D.N.J. June 5, 2020).

Plaintiffs' Complaint does just that. "A scheme is a plan or program of something to be done; an enterprise, a project; as, a business scheme, or a crafty, unethical project." *U.S. Sec. & Exch. Comm'n v. Winemaster*, 529 F. Supp. 3d 880, 917 (N.D. Ill. 2021). Here, the scheme was to mislead investors as to Abbott's compliance with FDA regulations ensuring the safety of PIF. Defendants' deceptive acts included deceiving the FDA inspectors in 2019 by concealing the release of contaminated PIF, destroying evidence after the first day of the FDA's 2022 inspection, falsifying testing, and retaliating against whistleblowers. *See* ¶474(i)-(xi). These deceptive acts were known to the Individual Defendants. *See infra* at 30-31, 34; *see also* ¶396.

Defendants respond to Plaintiffs' allegations with hyperbole, claiming that imposing scheme liability here would convert "any regulatory violation . . . or even mismanagement by a

public company [into] . . . securities fraud." D.Br. 28. This is not true. Courts within this District and throughout the country, both before and after *Lorenzo*, have upheld scheme liability claims when the deceptive acts include violating and concealing violations of FDA regulations. *See Able Lab'ys*, 2008 WL 1967509, at *21-22 (defendants engaged in "manipulative and deceptive conduct" that included falsifying data and forging records "to meet FDA standards"); *Klein v. Altria Grp., Inc.*, 525 F. Supp. 3d 638, 665 (E.D. Va. 2021) ("Defendants acted in concert to deceive the FDA."); *In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *18, *19 n.10 (W.D. Pa. May 18, 2023) (scheme liability sufficiently alleged when defendants violated FDA CGMPs, falsified data, and imposed "a pervasive, top-down scheme to dupe the FDA and ignore regulatory compliance best practices in the name of juicing manufacturing output and increasing corporate profits").

Completely ignoring *Lorenzo*, Defendants argue that a finding that "the conduct Plaintiffs allege violates securities laws is barred" by *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008), and *Pugh v. Tribune Co.*, 521 F.3d 686 (7th Cir. 2008), because the alleged deceptive conduct did not occur in "securities markets." D.Br. 28. Not so. *Stoneridge* limited ***non-speaker*** secondary liability for securities fraud claims ***against third parties*** with no role in making or disseminating false statements. 522 U.S. at 161. In *Pugh*, the court held that employees of a third-party subsidiary who had no role in preparing or disseminating the false statements could not be liable. 521 F.3d at 697. Here, in contrast, each Defendant, including Abbott, is a speaker who made statements and operated in the "securities market."

## III. The Complaint Adequately Alleges Defendants' Scienter

Scienter is an "intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319. Allegations of reckless conduct will suffice. *See, e.g.*, *Norfolk Cnty. Ret. Sys. v. Ustian*, 2009 WL 2386156, at *7-8 (N.D. Ill. July 28, 2009). "[O]ne of the classic fact patterns giving rise to a strong

inference of scienter is that defendants published statements when they knew facts *or* had access to information suggesting that their public statements were materially inaccurate." *Lewis v. Straka*, 535 F. Supp. 2d 926, 928-29 (E.D. Wis. 2008); *see also Makor Issues & Rights, Ltd. v. Tellabs Inc.* ("*Tellabs III*"), 513 F.3d 702, 704 (7th Cir. 2008) ("When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk."). When evaluating scienter, a court is required to examine "whether *all* of the facts alleged, *taken collectively*, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323 (first emphasis in original). The inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. Rather, "an inference at least as likely as competing inferences" is sufficient. *Id.* at 324 n.5.

The facts alleged in the Complaint, when viewed collectively (as they must be), raise a cogent and compelling inference of scienter. On the other hand, Defendants' claimed counter-inferences are neither cogent nor compelling. In fact, they border on the unbelievable.

## A.      The February 2021 Whistleblower Complaint Supports Scienter

In February 2021, the WB described why he "reasonably believed that [Abbott's] practices violated laws, regulations, and other guidance administered and enforced by the [FDA]" and how he had raised those concerns with management. ¶¶102-03; Ex. A at 1, 7-19. The WB described how Abbott created an unsanitary manufacturing environment at Sturgis that allowed the deadly *Cronobacter* bacteria to flourish. ¶103. The WB explained that executives—both on site at Sturgis and off—knew of these violations and helped conceal them from the FDA. *Id.* Abbott responded in April 2021. Defendants were aware of the foregoing. *See supra* 2, 7-8.

These are classic facts giving rise to a strong inference of scienter, and the only rational inference is that the Individual Defendants were aware of the WB allegations. A strong inference

exists when an "employee complaint put [defendant] on notice that there were serious compliance problems at the company." *Akorn*, 2020 WL 564222, at *14. That is particularly true here because OSHA was legally required to—and did—notify Abbott of the WB's complaint. *See Sinnathurai v. Novavax, Inc.*, 2022 WL 17585715, at *22 (D. Md. Dec. 12, 2022) ("Even in the absence of direct evidence . . ., the fact that Novavax was required by law to be informed of these FDA findings provides evidence in support of . . . scienter."). That Defendants affirmatively concealed Sturgis's condition from the FDA only bolsters the strong inference in this case. *See In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1166 (D. Or. 2015) (collecting cases). Defendants' counter-inference—that they "were not aware that serious problems at Sturgis existed," D.Br. 38—is inconceivable. "It is 'absurd' to think that the CEO and CFO of a pharmaceutical company would be unaware of the alleged substandard, non-compliant conditions pervading their company's manufacturing and quality control divisions." *Mulligan*, 36 F. Supp. 3d at 970; *see also In re Ulta Salon, Cosms. & Fragrance, Inc. Sec. Litig.*, 604 F. Supp. 2d 1188, 1197 (N.D. Ill. 2009) (finding unpersuasive inference that defendants "were essentially clueless as to the major problems existing within the company").

Defendants studiously avoid any discussion of the contents of the February 2021 WB Complaint and instead fixate on the lack of detail in the WB's pre-complaint letter to Abbott's General Counsel. This is a red herring. The letter is relevant because it was sent to the General Counsel, who reports to the CEO, Defendant Ford, and put the General Counsel on notice that a complaint was forthcoming. It is reasonable to infer that when the General Counsel received the WB Complaint, he shared the information contained therein with his superior, Ford. *See, e.g.*, *In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 174119, at *21 (C.D. Cal. Jan 16, 2013) ("[Those] who had access to information concerning these problems worked only one or two levels below [the CEO and CFO], supporting an inference that the information was communicated to them at

some point in time."); *3226701 Canada, Inc. v. Qualcomm, Inc.*, 2017 WL 4759021, at *23 (S.D. Cal. Oct. 20, 2017) (crediting scienter allegation that subordinate "would have kept [CEO] apprised of the thermal problems with the [product]"). Any lack of detail in the letter is irrelevant because Abbott received and responded to the detailed WB Complaint. ¶101.

Defendants also minimize the accounts of former employees, in particular FE2. *See* D.Br. 5-6, 30-32. FE2 was a senior Public Affairs and Media Relations executive who worked directly with Abbott senior executives, including Defendant Ford. ¶108. FE2 explained that because the February 2021 WB Complaint posed serious reputational and regulatory risks to Abbott it "would have reached the highest levels of Abbott's management, up to and including Defendant Ford." *Id.*; *accord* ¶¶400-01. This corroborates the WB's allegations that "senior management" knew of the issues at Sturgis. ¶397. And it makes perfect sense that the CEO would be notified when a federal regulatory agency initiates an investigation regarding serious quality control issues. *See, e.g.*, *Mulligan*, 36 F. Supp. 3d at 970; *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *15 (C.D. Cal. June 9, 2016) ("Given the importance of manufacturing and quality control . . . , it is a logical, and strong, inference that [individual defendants] were aware of the alleged severe and pervasive problems in [the manufacturing] facility.").

Moreover, FE2, as well as the four other FEs, were "in a position to know at first hand the facts to which they are prepared to testify." *Tellabs III*, 513 F.3d at 712 (crediting confidential witnesses); *Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *4 (N.D. Ill. Aug. 11, 2021) (same). "So long as plaintiffs describe with particularity the sources of their information, including how the sources were in a position to know the matters alleged, such allegations are sufficient." *Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *4 (N.D. Ill. Oct. 30, 2012). "[F]irsthand knowledge in a strict evidentiary sense" is not required. *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1243 (N.D. Cal. 2008). Confidential employees are useful when, as here, their "context and access

to critical information makes [them] reasonably reliable, such that his or her conclusions about the inner workings of the company are not speculative but reasonably informed." *Id.*; *see also Shah*, 348 F. Supp. 3d at 844 (crediting witnesses whose "accounts are partially corroborated by one another, as well as other evidence").

### B. The Form 483 Reports and EIRs Support a Strong Inference of Scienter

Even if the WB Complaints and OSHA investigation were not enough—and they are more than enough—Abbott's receipt of multiple Forms 483 regarding Sturgis provides further evidence of scienter. *See Mulligan*, 36 F. Supp. 3d at 970 ("The idea that the defendants here would be unaware of these manufacturing and quality control problems is even more unlikely given the repeated Form 483s and the Warning Letter from the FDA.").

In both September 2019 and September 2021, Abbott and the Individual Defendants received Forms 483 and more detailed EIRs documenting the serious and pervasive issues at Sturgis. ¶¶69-70, 162-76, 206-18, 405-10. The FDA personally gave copies of these reports directly to Sturgis's top site officials. They were also sent to "the top management of the firm" (i.e., of Abbott), and best practices dictate that any response to a Form 483 "include a commitment/statement from senior leadership." ¶¶169, 171. Defendants concede that Defendant Randall received the reports and was copied on the responses. D.Br. 32; ¶171. And, not only did the Individual Defendants all have access to the reports through "TrackWise" (¶413), but FE2 confirmed that the Individual Defendants would have reviewed this material. ¶171.

In similar circumstances, courts hold that Form 483 Reports support a strong inference of scienter. *See, e.g.*, *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 2013 WL 1831427, at *2 (E.D. Mo. Apr. 30, 2013) ("It seems extremely unlikely that [the CEO] did not have access to the information contained in the Forms 483 prior to signing the Forms 10-K."); *Able Lab'ys*, 2008 WL 1967509, at *16 ("The Form 483 and the warning letter provided notice to the defendants that serious

problems existed in the manufacturing process at Able."); *In re Mylan*, 2023 WL 3539371, at *18 (strong inference of scienter when "Defendants had access to observations and warnings from the FDA"). Inferring ignorance from such facts would, on the other hand, be unreasonable. *See Novavax*, 2022 WL 17585715, at *22 (strong inference of scienter when FDA findings were required to be transmitted to corporate defendant); *Todd*, 2016 WL 6699284, at *13 ("It is reasonable to infer that the FDA inspector's communications with 'management' either were conducted directly with [a VP and the CEO] or were at least reported to them.").

Unable to deny receipt of the FDA reports, Defendants try to minimize them, claiming that the FDA issues "thousands of Form 483" reports. D.Br. 6. True or not, this is irrelevant. *See, e.g.*, *In re Eng'g Animation*, 110 F. Supp. 2d at 1195 ("[T]he fact that many companies were doing the same thing . . . does not excuse a fraudulent practice."). For Abbott, the receipt of a Form 483 was not a common event. On May 25, 2022, Defendant Calamari testified that before 2019, Abbott's Sturgis facility "had many, many years of no observations." D.Ex. 23 at 219.

Defendants also falsely claim that neither the 2019 nor 2021 Forms 483 "even mentions *Cronobacter*, *Salmonella*, or any other bacterial contamination." D.Br. 35. In fact, the heavily redacted 2019 EIR describes: (i) the detection of *Cronobacter* in finished product and a *Cronobacter* infection linked to Sturgis PIF; (ii) "positive EB [bacteria including *Cronobacter* and *Salmonella*] samples in several non-product contact areas and one product contact area"; (iii) six positive results for Listeria between April and June 2019; and (iv) a host of other unsanitary conditions including cracks and stains involving formula dryers. ¶¶166-68, 174-75; *see also* Ex. G at 9-10, 12-13, 16, 19-20. The 2019 Form 483 also found that Abbott was not complying with the FDA and the Company's own stated procedures for testing finished product for "microbiological quality standards." ¶167. *See Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 235 (D. Mass. 1999) ("[V]iolation of a company's own policy supports an inference of scienter.").

Defendants further assert that, even assuming the Individual Defendants did know of the 483s and EIRs, the most rational inference is that they viewed these issues as a "hitch or glitch, [or] pratfall" in operations. D.Br. 39. No reading of the Complaint supports such an inference. *See In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 416-17 (S.D.N.Y. 2007) (noting that, while *Tellabs* allows courts to consider "competing non-culpable inference[s]," the "factual allegations giving rise to th[e] inference[s] must appear on the face of the complaint"). In fact, the Complaint describes a regulatory catastrophe. The 2021 FDA inspection, which preceded Sturgis's total shut down by just a few months, listed five negative observations, all addressing systemic safety and hygiene violations that directly implicated the risk of microbiological contamination. ¶¶174-75, 177. This Form 483 occurred simultaneously with a report of a *Cronobacter* infection in an infant linked to Sturgis. In that regard, the FDA documented two instances of *Cronobacter* contamination, and 16 complaints of Sturgis-related complaints of *Cronobacter* and *Salmonella* illnesses and one infant death. D.Ex. 15 at 25, 27, 32. Defendants' suggestions that this was some minor regulatory snafu is not credible.

Defendants' cited case law (D.Br. 33) is as unpersuasive as their claimed counter-inferences. For example, in *In re Genzyme Corp.*, the court found that the Form 483 CGMP deficiencies were not sufficiently tied to defendants' public disclosures concerning the status of FDA approval for a specific drug. 2012 WL 1076124, at *10 (D. Mass. Mar. 30, 2012). Here, there is no doubt that the same problems the FDA began alerting Abbott to in 2019 (¶¶162-71, 405-10) are the problems that led to *Cronobacter* contamination and the shutdown of Sturgis. *See Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at *25 (N.D. Ill. Apr. 18, 2022) (finding scienter based in part on regulatory reports that "contained not mere accusations, but conclusions" that "directly related to and contradicted" defendants' statements).

C. **Investigations, DOJ Complaint, and Consent Decree Support Scienter**

There are three open criminal and civil investigations of the Company (by the DOJ, the SEC, and the FTC), which all followed the DOJ Complaint and Consent Decree. ¶¶414-21, 427-30. "[G]overnment investigation[s] can be seen as one more piece of the [scienter] puzzle." *Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 115 (D. Mass. 2014); *see also In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) (finding SEC and DOJ investigations support a strong inference of scienter).

Defendants completely ignore the DOJ Complaint, even though it names Randall as a defendant. And they only once mention the DOJ Consent Decree (signed by Defendant Randall individually and on behalf of Abbott). D.Br. 4. The Consent Decree is critical because the DOJ found that Abbott was "unwilling or unable to implement sustainable corrective actions to ensure the safety and quality of food manufactured for infants." ¶¶16, 248-53, 414-21. Try as they might, Defendants cannot simply "will" these events away.

**D.    The Importance of Infant Formula to Abbott's Business Supports Scienter**

The core operations doctrine supports a strong inference of scienter given that "officers of a company can be assumed to know of facts critical to a business's core operations." *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1028 (N.D. Ill. 2010). In this Circuit, scienter can be inferred when the fraudulent acts and statements relate to "a significant part" of a company's "financial picture that cannot be expected to evade executive knowledge altogether." *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 937 (7th Cir. 2018); *Allison*, 2023 WL 1928119, at *10 (applying "significant part" test and finding referrals that "accounted for less than 10% of new patients in 2021" qualified as core operations when plaintiffs explained "why the referrals [constituted] . . . a significant aspect of [defendant]'s business").

Not only was Abbott's production of PIF financially "significant," but producing quality and safe PIF was reputationally important because so many infants depended on it. ¶¶42-46, 84-

92, 227-28, 402-09. Accordingly, PIF qualifies as a core operation. *See* Michael J. Kaufman & John M. Wunderlich, *Messy Mental Markers: Inferring Scienter from Core Operations in Securities Fraud Litigation*, 73 Ohio St. L.J. 507, 517 (2012) ("Courts have recognized that the core operations inference extends to any matter of importance that might affect the company in a significant way."). Contrary to Defendants' claim (D.Br. 2-3, 36), "[a] product need not have an outsized impact on a company's financial performance to constitute a 'core operation'; **products that present substantial reputational risk may suffice as well**." *Industriens Pensionsforsikring v. Becton, Dickenson & Co.*, 620 F. Supp. 3d 167, 196 (D.N.J. 2022); *Allegheny Cnty. Emps' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 232 (E.D. Pa. 2021) (applying "core operations" doctrine to small revenue project with "independent reputational value").

Defendants disclaim liability by arguing that scienter is "irrational" here because it would have only been a "minor hit" for the Company to have "corrected the problems in advance" of the PIF recall. *See* D.Br. 39-40. The far more compelling inference is that Defendants gambled that a substandard production environment at Sturgis would suffice and that corporate profitability should not be reduced in the name of safety. That Defendants' "gamble—concealing bad news in the hope that it [would] be overtaken by good news—fail[ed] is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." *Tellabs III*, 513 F.3d at 710; *see Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 728 (7th Cir. 2004) ("[T]he securities laws forbid foolish frauds along with clever ones.").

Additionally, Defendants' argument cannot be squared with Abbott's repeated statements to the effect that the safety of its infant formula was of critical importance to Abbott's Nutrition division. ¶¶84-98. Such recurring public pronouncements about the Company's efforts to ensure product safety and quality control solidify its position as a core operation. *See Theodore v. Purecycle Techs., Inc.*, 2023 WL 4035880, at *6 (M.D. Fla. June 15, 2023) (finding that "repeated

manner in which Defendants" spoke supported a strong inference of scienter).

### E. Defendants' Site Visits to Sturgis Support a Strong Inference of Scienter

In addition to the WB Complaint, the Forms 483 and EIRs, and consumers' and employees' complaints, the Individual Defendants, in particular Defendant Randall, who was responsible for oversight of food safety and product quality at Sturgis, ¶34, "visited the Sturgis site several times a year," ¶¶139, 411-12. This means that they "saw first-hand the plant's flagrant violations." *Id.* Yet the Individual Defendants dangled funding for improvements like a carrot that employees had to earn by meeting and increasing production metrics. ¶139. Courts routinely hold that such access to information is a "classic fact pattern[]" supporting a strong inference of scienter. *Flynn*, 2021 WL 1561712, at *10; *Dahhan v. OvaScience, Inc.*, 2018 WL 3637969, at *6 & n.5 (D. Mass. July 31, 2018) (allegations that "executives regularly visited clinics and had access to data" "support[ed] the strong inference Defendants knew, or were recklessly unaware of," the truth).

Defendants claim that "Plaintiffs allege nothing about what visitors saw at Sturgis or whether issues like those identified in the Forms 483 were perceptible to them." D.Br. 35. That is not true but, even if it were, such allegations are not necessary. Sturgis was in markedly poor condition, and any corporate visitor would or should have noticed. *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (inference of scienter supported by "egregious refusal to see the obvious"). In that regard, FDA Commissioner Califf starkly described what "visitors saw" at Sturgis:

> Let's say you had a next door neighbor who had leaks in the roof. They didn't wash their hands. They had bacteria growing all over the kitchen. You walked in and there was standing water on the counters and the floor, and the kids were walking through with mud on their shoes and no one cleaning it up. You probably wouldn't want your infant eating in that kitchen. And that is in essence what the inspection showed. . . . [T]hese are just the facts that we saw.

¶¶1, 266. It is simply not plausible that the Individual Defendants overlooked these obvious poor conditions on their visits. *See Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 860 (N.D.

Ill. 2009) ("[A] strong inference of scienter may still be credited where 'it is almost inconceivable' that an individual defendant would be unaware of the matters at issue."). Judges need not check their common sense at the courthouse steps when evaluating allegations of scienter. *See, e.g.*, *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 631 (E.D. Va. 2000) ("holistic analysis" of scienter premised on "logic, common sense, and human experience").[12]

### F.    Defendants' Post-Recall Actions Also Support a Strong Inference of Scienter

Defendants' actions following the recall further support an inference of scienter. Defendants Ford and Calamari continued to mislead the public and Congress. Defendant Ford misleadingly denied any link between the Sturgis facility and the four reported infant illnesses. ¶¶259-60, 445. The former FDA Deputy Commissioner called these statements "misleading." *See supra* 12, 23. *See, e.g.*, *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1338 (S.D. Fla. 1999) ("[D]enials indicate that [they] were either sufficiently familiar with the facts, or severely reckless in not being familiar, to be in a position to issue a denial.").

Moreover, on March 21, 2022, Defendant Ford apologized and admitted that Abbott "fell short" of his expectations, that the FDA discovered *Cronobacter* at Sturgis, and that Abbott would need to "earn[] back" the public's trust. ¶446. Defendant Calamari also apologized on May 25, 2022, saying that Abbott was "deeply, deeply sorry." *Id.* On the last day of the Class Period, Defendant Ford acknowledged that Abbott had "made leadership changes, both at our Sturgis site and in our quality organization." ¶431. Courts regularly hold that such admissions of fault and subsequent "house-cleaning" (i.e., leadership changes) are indicative of scienter. *See, e.g.*, *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016) ("[A]n

---

[12] Suspicious insider sales are not required to allege scienter. D.Br. 39. *See, e.g.*, *Ross*, 2012 WL 5363431, at *11 ("[W]here the complaint's other allegations provide a strong basis to infer intent, there is little if any significance attributable to the absence of an allegation of a personal financial motive.").

admission of fault by "management" as a whole may be enough for a court to infer scienter even if the company was unwilling . . . to disclose specifically who was responsible."); *In re Am. Serv. Grp., Inc.*, 2009 WL 1348163, at *58 (M.D. Tenn. Mar. 31, 2009) ("[H]ouse-cleaning and reforms do not follow innocent mistakes.").[13]

## G. The Complaint Sufficiently Pleads Corporate Scienter As to Abbott

Finally, Defendants argue that "[a]bsent allegations about who prepared or approved an alleged misstatement and what that person knew, Plaintiffs have not met their burden to plead corporate scienter." D.Br. 38. However, the Seventh Circuit, in the very case Defendants rely upon, held that "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud." *Tellabs III*, 513 F.3d at 710; *see also Kraft*, 2021 WL 3566602, at *14 (complaint "pleads a strong inference of [corporate] scienter . . . based on the allegations that ***non-Defendant*** executives knew or had access to information . . . that contradicted the Company's public statements"). Plaintiffs have amply pled that executives at Abbott, both Defendant and non-Defendant, "knew or had access to information" that contradicted the false statements at issue, adequately alleging Abbott's scienter.[14]

## CONCLUSION

The Motion to Dismiss should be denied in its entirety. Plaintiffs respectfully request the right to amend in the event the Motion is granted in whole or in part. *See, e.g., Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, 2011 WL 1303387, at *31 (N.D. Ill. Mar. 31, 2011).

---

[13] Defendants' cases involve far different circumstances. *See* D.Br. 36-37. For example, *Louisiana School Employees' Retirement System v. Ernst & Young, LLP*, did not involve public apologies or any acknowledgment that drastic steps were required for the company to meet its standards; only a vague statement that "there was a problem." 622 F.3d 471, 484 (6th Cir. 2010). Furthermore, in *Baxter*, the court found the bulk of bonus claw-backs were not punitive, but rather were designed to reflect the company's "actual performance." *In re Baxter Int'l Inc. Sec. Litig.*, 2021 WL 100457, at *17 (N.D. Ill. Jan. 12, 2021).

[14] Because Plaintiffs allege §10(b) violations, the Court should decline to dismiss the control person claim under Section 20(a). *See In re Motorola Sec. Litig.*, 2004 WL 2032769, at *35 (N.D. Ill. Sept. 9, 2004).

Dated: August 7, 2023

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

**MOTLEY RICE LLC**

*/s/ Salvatore J. Graziano*
Avi Josefson
875 North Michigan Avenue, Suite 3100
Chicago, Illinois 60601
Telephone: (312) 373-3880
Facsimile: (312) 794-7801
avi@blbglaw.com

-and-

Salvatore J. Graziano (admitted *pro hac vice*)
Lauren A. Ormsbee (admitted *pro hac vice*)
Veronica V. Montenegro (admitted *pro hac vice*)
Timothy Fleming (admitted *pro hac vice*)
Emily A. Tu (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
lauren@blbglaw.com
veronica.montenegro@blbglaw.com
timothy.fleming@blbglaw.com
emily.tu@blbglaw.com

*Counsel for Co-Lead Plaintiff Quoniam Asset*
*Management GmbH and Co-Lead Counsel*
*for the Class*

*/s/ Gregg S. Levin*
Gregg S. Levin
Lance V. Oliver
Christopher F. Moriarty
Erin C. Williams
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
glevin@motleyrice.com
loliver@motleyrice.com
cmoriarty@motleyrice.com
ecwilliams@motleyrice.com

-and-

Serena P. Hallowell
777 Third Ave., 27th Floor
New York, NY 10017
Telephone: (212) 577-0040
Facsimile: (212) 577-0054
shallowell@motleyrice.com

*Counsel for Co-Lead Plaintiff KBC Asset*
*Management NV and Co-Lead Counsel for*
*the Class*